**NATIONAL LABOR RELATIONS BOARD**
**v. GRISWOLD MFG. CO.**
No. 6831.

Circuit Court of Appeals, Third Circuit.

Sept. 20, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and A. Norman Somers, Laurence A. Knapp, and Marcel Mallet-Prevost, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

W. Pitt Gifford and Orson J. Graham, both of Erie, Pa., for respondent.

Before MARIS and CLARK, Circuit Judges, and KALODNER, District Judge.

KALODNER, District Judge.

Is recognition of the union the essential basis of the collective bargaining guaranteed by the National Labor Relations Act (Act of July 5, 1935, c. 372, 49 Stat. 449,

U.S.C., Supp. II, Title 29, Sec. 151 et seq., 29 U.S.C.A. § 151 et seq.) ?[1]

That is the paramount issue involved in this proceeding. Both the petitioner and respondent have asserted their positions concisely in their respective Reply Briefs.

"The prime requisite and first step to collective bargaining is, therefore, union recognition": page 9, Reply Brief, National Labor Relations Board, petitioner.

\*　　\*　　\*　　\*　　\*

"This obviously does not support the statement that union recognition is necessary, but only that the employer meet and confer with the authorized representatives of its employees \* \* \*". Page 7, Reply Brief, Griswold Manufacturing Company, respondent.

While there are other issues involved, hereinafter discussed in detail, the issue of union recognition is the crux of this controversy.

Briefly stated, the employer-respondent refused to recognize the union, comprised of a majority of its employees, for the purpose of collective bargaining. It chose to "recognize", instead, a committee named by the union as a "Plant Committee". It contends that that is all it is required to do under the terms of the Wagner Act; that is, to "meet and confer with the authorized representatives of its employees."

It is the respondent's contention, in substance, that the Wagner Act in its essence intends nothing more than that there shall be a bargaining between employer and employee.

We cannot subscribe to that contention. Indeed, the very soul of the Wagner Act is its mandate that the employer shall, if the employees so desire, bargain with the union of the employees as a unit, and the recognition of that unit in the bargaining process.

We feel most strongly that to adopt the respondent's contention would be to destroy the Wagner Act.

Language is often used as a medium to conceal thoughts and objectives. Respondent professes its compliance with the Wagner Act. Its actions speak louder than its words—else we would not be called upon to make a decision in this proceeding.

As was said in National Labor Relations Board v. Jones & Laughlin Steel Co., 301 U.S. 1, page 42, 57 S.Ct. 615, page 626, 81 L.Ed. 893, 108 A.L.R. 1352: "Experience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances."

Denial of union recognition is a vitiation of the rights of employees to organize into unions, and, as stated by Section 151 ("Findings and Declaration of Policy") of the National Labor Relations Act: "The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of

---

[1] The relevant provisions of the Act are as follows:

"Sec. 8 [§ 158]. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title].

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it:

\*　　\*　　\*　　\*　　\*

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a) [159(a) of this title]."

Section 7 provides:

"Sec. 7 [§ 157]. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 9 (a) provides:

"Sec. 9 [§ 159]. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit apppropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: \* \* \*."

burdening or obstructing commerce \* \* \*."

Collective bargaining is one of the principal intendments of the National Labor Relations Act. Equal in importance is the intendment of this Act that employees shall be given the right to organize.

Accomplishment of the intendments (1) to organize and (2) to bargain collectively, become a mockery if recognition of the bargaining agency is withheld.

Before proceeding with further discussion of this paramount issue, a brief statement of the facts and contentions of the parties, as well as the rulings of the petitioner, is appropriate.

■ The National Labor Relations Board has petitioned this court for enforcement of its order dated March 30, 1938, requiring the respondent, the Griswold Manufacturing Company, of Erie, Pennsylvania, to cease and desist from certain unfair labor practices under the National Labor Relations Act (49 Stat. 449, 29 U.S.C.A. § 151 et seq.) and to take affirmative action which the Board found would effectuate the policies of the Act.

The respondent, the Griswold Manufacturing Company, filed no answer to the Board's petition. Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e), providing for proceedings in this court, makes no mention of a respondent's answer. Nevertheless, the filing of such an answer was impliedly sanctioned in National Labor Relations Board v. Biles-Coleman Lumber Company, 9 Cir., 98 F.2d 18, and the practice of filing an answer is to be commended, in order that the issues may be defined, and undisputed matters the more readily eliminated from consideration.

In the absence of an answer to the petition of the board, it will be assumed that the respondent raises only those issues argued in its briefs and orally before this court.

Accordingly it will be taken as conceded that the Board made the order here sought to be enforced, and that the order was made after due notice and hearing upon a complaint duly issued pursuant to Section 10 of the Act, 49 Stat. 453, 29 U.S.C.A. § 160.

The order on its face seems to be neither unlawful nor improper; and appears to be in consonance with the powers and duties of the National Labor Relations

Board as provided for in the National Labor Relations Act. Respondent does not challenge either the jurisdiction of the Board or of this court.

The Board found that the respondent violated the National Labor Relations Act, supra, and was guilty of unfair labor practices thereunder, in that it failed to bargain collectively, as required by the Act, and in that it dominated and interfered with the formation of what the Board denominates an employees' union, and with its administration; and that by such acts the respondent interfered with, restrained, and coerced its employees in the exercise of their rights granted in Section 7 of the Act.

The objections of the respondent to the order of the Board are based on its contentions that:

(1) Respondent did not fail to bargain collectively, but, on the contrary, the evidence shows that it did bargain collectively with the representatives of its employees;

(2) There was no such domination or interference by the respondent with the formation and administration of the employees' union as to justify the cease and desist order of the board;

(3) The examiner of the board admitted incompetent and irrelevant testimony at the hearing, to the prejudice of the respondent, which evidence was utilized by the board in arriving at its findings and in making its order.

The facts are as follows:

Following charges filed against respondent by Amalgamated Association of Iron, Steel, and Tin Workers of North America, Lodge 1197 (hereinafter referred to as the Lodge), a complaint was issued by the board, and an answer filed by the respondent; and hearings were held, after due notice, before a trial examiner during the period September 27, 1937 to October 1, 1937.

The trial examiner filed an intermediate report, and the order of the board followed.

The board found that the respondent was a corporation of the State of Pennsylvania, with its plant and office in Erie, Pennsylvania. It is engaged in the production, sale, and distribution of stoves, stove furniture, hollow-ware, castings of iron and aluminum, domestic cooking utensils, kitchen hardware specialities, and other cooking utensils. Twenty-five per cent of

the raw materials used in the production of its products are obtained from without the State, and ninety per cent of its finished products are shipped out of the State.

The board further found that the appropriate unit for collective bargaining, Section 9(b), 29 U.S.C.A. § 159(b), was composed of the production employees of the respondent, to the number of approximately 370, excepting clerical and office employees, foremen and supervisory employees, and watchmen. It found that the Lodge included a clear (and high) majority of the employees in the appropriate unit, and that the Lodge was the exclusive representative of all the employees in such unit for purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment.

The board further found that on April 2, 1937, and at all times thereafter, the respondent refused to bargain collectively with the Lodge as the exclusive representative of its employees in respect to rates of pay, wages, hours of employment, and other conditions of employment, in that the respondent at all times refused to negotiate with the committee of the Lodge *as a representative of the Lodge,* but chose instead to treat the committee as a *committee of its employees;* wherefore, the board found, the respondent was engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(5) of the Act, 29 U.S.C.A. § 158(5).

It was further found that the respondent dominated and interfered with the formation of an employees' union in June, 1937, and at all times thereafter dominated and interfered with its administration, and contributed support to it; and that by such acts the respondent interfered with, restrained, and coerced its employees in the exercise of the rights granted in Section 7 of the Act (29 U.S.C.A. § 157); wherefore, the board found, it engaged in unfair labor practices within the meaning of Section 8(1) and (2) of the Act, 29 U.S.C.A. § 158(1, 2).

The board concluded its findings with the declaration that the unfair labor practices of the respondent, as set forth in its findings, are unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act, 29 U.S.C.A. § 152(6, 7).

Finally, the board found that the refusal to engage in collective bargaining was the cause of a strike by the employees, and that the domination of, and interference with, the employees' union, coupled with the refusal to bargain collectively, was responsible for the respondent's success in breaking the strike.

On the basis of its findings, the board ordered the respondent to cease and desist from refusing to bargain collectively with the Amalgamated Association of Iron, Steel, and Tin Workers of North America, Lodge 1197, as the exclusive bargaining representative "of all its production employees, except clerical and office employees, foremen and supervisory employees, and watchmen"; from dominating or interfering with the administration of the employees' union, or with the formation and administration of any other labor organization of its employees, and from contributing any support to any labor organization of its employees; and from interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization and collective bargaining.

It was further ordered that the respondent take the following affirmative action:

Upon request, to bargain collectively with the Lodge as the exclusive representative of the employees of the abovementioned appropriate unit; to withdraw all recognition from the employees' unit of the respondent as representative of the said employees, and completely disestablish the employees' union as such representative; and to post and maintain notices conspicuously throughout its plant stating that the respondent had complied with the orders of the board.

We pass to a review of the findings.

*As to interstate commerce:* The board has found, and the respondent's answer to the board's complaint has admitted, that the respondent is engaged in interstate commerce among the several states of the union; the respondent further admits in its answer that the operation of its plant and business has a close, intimate, and substantial relation to trade and commerce among the several states. There is no denial that the respondent is subject to the National Labor Relations Act.

*The appropriate bargaining unit:* The board has found that the production employees of the respondent, with the exceptions noted, constituted the appropriate bargaining unit, and that Lodge 1197 was

the exclusive representative of all the employees in such unit for purposes of collective bargaining. The respondent does not contest this finding; on the contrary, it insists in its brief that it recognized the Lodge committee as the "bargaining agent for its employees". As a matter of fact, it was testified without contradiction that, out of about 370 employees in the appropriate unit (the production department), 330 were members of Lodge 1197 on April 2, 1937.

Section 9 (b) of the Act, 29 U.S.C.A. § 159 (b), gives to the board the power and duty to decide which is the unit appropriate for the purposes of collective bargaining.

Upon the evidence as stated in the record, the finding of the board in this respect is sustained.

*The Unfair Labor Practices:* The gravamen of the board's charges was the respondent's failure to bargain collectively (in that the respondent continually refused to recognize or negotiate with Lodge 1197 as a representative of the employees), this failure and refusal being the fundamental cause which engendered the strike; and that the respondent was instrumental in the organization of the employees' union formed while the strike was going on, and in a substantial measure directed and controlled its activities and policy.

Early in April, 1937, Lodge 1197 had a series of conferences with the authorized representatives of the respondent concerning demands relating to pay, hours, and working conditions. At a meeting on May 5 the management submitted to the Lodge a so-called "declaration of policy" as constituting the concessions which the respondent was willing to make in response to the demands. The Lodge objected on the grounds that (a) the document did not recognize the Lodge as the exclusive bargaining representative; (b) that it was not in the nature of a contract, but was a mere unilateral statement of policy; and (c) that it contained no grievance procedure. R. W. Griswold, President of the respondent company, stated that he was not ready to recognize or enter into any agreement with Lodge 1197. No agreement was reached.

At another meeting on May 10 the respondent presented another "declaration of policy" which differed from the first only in that it made a concession as to working hours. The same objections were raised, and the management reiterated that it was not willing to enter into any agreement recognizing Lodge 1197 as the exclusive representative of its employees. No agreement was reached.

The strike followed three days later. It was based on two grounds: (a) respondent's refusal to recognize Lodge 1197 as the exclusive representative of its employees; and (b) failure to enter into a written agreement.

Further meetings were held and some concessions were made by the management in rate of wages, but the respondent was still adamant in its refusal to recognize Lodge 1197 as the exclusive representative of its employees.

After some attempts by the management to end the strike by talking to various employees, several of the latter met at various times with Trask, foundry superintendent of the respondent, and Snell, secretary of the respondent and plant manager, and discussed the strike and its possible termination. At these meetings for the first time the matter of the formation of an independent union was discussed, and Snell recommended that William Washebaugh, an attorney who had assisted in the formation of a similar union elsewhere, be consulted. Snell said the attorney's fee "would be taken care of." Washebaugh joined the conferences, and the independent union was actually formed. Application blanks, bearing the caption: "Employees' Union of the Griswold Manufacturing Company" were ordered printed and the bill charged to Washebaugh. There is no evidence that any dues were ever paid or that there was any source of revenue. The employees who were present at these conferences commenced to solicit memberships to the employees' union and reported progress to Snell, and submitted to him for approval a speech intended to be made to the employees. A telegram was sent out under the aegis of this new company union to all the employees, calling them back to work at a specified time and place. Washebaugh was present at the time and place specified, and attempted to lead the men who had responded back to work, but they did not enter the plant.

However, a conference between Lodge 1197 and the new employees' union was agreed upon and held. At the meeting a written agreement was executed by the two organizations concerning fresh negotiations with the respondent. Meetings of a joint committee of the Lodge and the

employees' union were then held with the respondent, and a written agreement entered into. Lodge 1197 requested that the committee sign the agreement as representing Lodge 1197, but to this the management refused to agree, and no reference is made to Lodge 1197 in the instrument. In conformity with the agreement, the plant re-opened and all the employees returned to work.

There is further testimony in the record, not necessary to be specified here, concerning the activities of certain supervisory employees of the respondent in soliciting membership to the new union under threats of discharge from employment.

In our opinion, the facts recited afford ample ground for the findings of the Board that the respondent is guilty of unfair labor practices: that it refused to bargain collectively, and that it interfered with and dominated the formation of the employees' union and with its administration. The consistently maintained refusal of the respondent to recognize Lodge 1197, *qua union lodge,* as the representative of the employees, is a refusal to bargain collectively, notwithstanding the respondent's willingness to recognize a group of members of the Lodge as such representatives.

This refusal was one of the direct and fundamental factors that led to the strike. Thus a situation was created precisely such as was contemplated by the National Labor Relations Act, and such as the provisions of the Act were designed to prevent. The opening words of the Act, quoted above delineate exactly the picture in this case: "The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessery effect of burdening or obstructing commerce * *." Section 1, 29 U.S.C.A. § 151.

We are not unmindful of respondent's insistence that it did afford union "recognition". An examination of the Record effectually disposes of this contention.

Direct testimony of Paul Nunes, witness for the petitioner:

"Q. Do you recall whether you had any other objections outside of the grievance procedure? A. In the signing of this memorandum of understanding they (the respondent) would not let the Union representative and myself sign with them.

"Q. Do you mean as representatives of the Union? A. Yes." (R. page 102).

Cross examination of William H. Cleary, witness for the petitioner: "A. * * * When it come to actually signing they wanted me to sign as President of the Negotiating Committee. They didn't want to put on there President of 1197. So they refused to let Nunes sign on there and in the preamble where we always wanted to insert 1197, they wanted it 'Employees,' that they were dealing with us in that respect * * *". (R. page 185).

Respondents exhibit No. 1, pages 745, 751, of the supplemental record shows that this agreement was signed on behalf of the employees by "William H. Cleary, Chairman, Plant Negotiating Committee."

Cross examination of Ely Griswold, of the respondent company: "Q. Did you state that you recognized the committee as a committee of the union representing your employees? A. We did not." (R. page 434).

And again, in cross examination of the same witness:

"Q. Now, during all your testimony, haven't you testified—A. And those—

"Q. Just a minute—That that committee was, in fact, a committee of the union which represented your employees? A. We understood so and we recognized them as such.

"Q. Well, then, why didn't you put that in the memorandum? A. Because the law does not require it." (R. pages 453, 454).

Respondent's reply brief, in contending that the respondent granted union recognition in fact, asserts, in italics: "There is no ritual or formula required to constitute union recognition."

We are heartily in accord with this statement, but not with the respondent's application thereof in the instant case. The truth is that the respondent professes to observe the ritual while avoiding adherence to the principle. It pretends to accord union recognition by its assertions, but withholds it in fact—as witness, inter alia, its absolute and unqualified refusal to permit the name of Lodge 1197 to appear in its written agreement.

█ There is no merit in any contention that a willingness to bargain collectively, accompanied by a refusal of recognition of the appropriate bargaining unit as such, or as a representative of its union, meets the requirements of the Act. Such an attitude

directly violates the spirit and tenor of the statute. In social legislation of this sort it is perhaps more important than in any other field of legislation that no mere lip service be permitted as a substitute for an honest and sincere compliance with the provisions of the law.

Mr. Chief Justice Hughes, in Consolidated Edison Co. et al. v. National Labor Relations Board et al., 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126, succinctly stated the objectives of the National Labor Relations Act: *"The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining.* Under Section 7 (29 U.S.C. § 157, 29 U.S.C.A. § 157) the employees of the companies are entitled to self-organization, to join labor organizations and to bargain collectively through representatives of their own choosing. The 80 per cent of the employees who were members of the Brotherhood and its locals, had that right. They had the right to choose the Brotherhood as their representative for collective bargaining and to have contracts made as the result of that bargaining. * * * Moreover, the fundamental purpose of the Act is to protect interstate and foreign commerce from interruptions and obstructions caused by industrial strife. This purpose appears to be served by these contracts in an important degree. * * *" (Italics ours).

The importance of union recognition, collective bargaining and the protection of the right of employees to self-organization, have been repeatedly asserted by the Supreme Court. The entire community reaps distinct economic advantage from their existence.

In Texas & New Orleans Railroad Company et al. v. Brotherhood of Railway & Steamship Clerks et al., 281 U.S. 548, page 570, 50 S.Ct. 427, page 434, 74 L.Ed. 1034, a case arising under the Railway Labor Act of May 20, 1926, 45 U.S.C.A. § 151 et seq., it was said: "It has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work: American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360. Congress was not required to ignore this right of the employees but could safeguard it and seek to make their appropriate collective action an instrument of peace rather than of strife. Such collective action would be a mockery if representation were made futile by interferences with freedom of choice."

Commenting upon this case, Mr. Justice Stone said, in National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., et al., 303 U.S. 261, 266, 58 S.Ct. 571, 574, 82 L.Ed. 831, 115 A.L.R. 307: "Congress, in enacting the National Labor Relations Act, had in mind the experience in the administration of the Railway Labor Act, and declared that the former was 'an amplification and further clarification of the principles' of the latter. Report of the House Committee on Labor, H.R. 1147, 74th Cong., 1st Sess., p. 3. *It had before it the Railway Clerks Case which had emphasized the importance of union recognition in securing collective bargaining,* Report of the Senate Committee on Education and Labor, S.Rep. 573, 74th Cong., 1st Sess., p. 17, and there were then available data showing that once an employer has conferred recognition on a particular organization it has a marked advantage over any other in securing the adherence of employees, and hence in preventing the recognition of any other." (Italics ours.)

And again in National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 255, 257, 59 S.Ct. 490, 496, 83 L.Ed. 627, it was said: "We think that the true purpose of Congress is reasonably clear. Congress was intent upon the protection of the right of employees to self-organization and to the selection of representatives of their own choosing for collective bargaining without restraint or coercion. * * * We repeat that the fundamental policy of the Act is to safeguard the rights of self-organization and collective bargaining, and thus by the promotion of industrial peace to remove obstructions to the free flow of commerce as defined in the Act."

In the final analysis, the benefits to interstate commerce sought to be effected by the Act through the medium of improvements of and equalization of bargaining power, in capital-labor relations, will not be realized unless employers make more than a pretense of compliance with the terms of the Act. The latter is an expression of the national policy that employees must not be deprived—if they desire it—of the opportunity to bargain through *union*

representatives. But this is specifically the deprivation which the respondent here attempted to effect. Its contention that its refusal to recognize Lodge 1197 as the representative of the union was not a violation of the Act, because it was willing to recognize the "Committee" as the representative of the plant employees, cannot prevail.

The finding of the Board, therefore, that the respondent was guilty of unfair labor practices in that it refused to bargain collectively, is sustained.

So also must we sustain the finding of the Board that the respondent interfered with and dominated the formation and administration of the employees' union. The evidence relating thereto has already been outlined. While the respondent offered some evidence in contradiction, the findings of the board sustain the complaint in this regard: there is adequate testimony to support its findings: and accordingly the findings are conclusive upon us. "The findings of the Board as to the facts [upon petition to a Circuit Court of Appeals for enforcement of the Board's order], if supported by evidence, shall be conclusive". 49 Statutes 453, Section 10(e), 29 U.S.C.A. § 160(e): see the cases collected in 29 U. S.C.A. § 160, Notes 8 and 9; also National Labor Relations Board v. Columbian Enameling & Stamping Company, Inc., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660.

The respondent's vehement denial that it dominated and interfered with the formation of the employees' union brings irresistibly to mind the language of Mr. Chief Justice Hughes in the Railway Clerks case, supra, where the railroad was charged with promoting the organization of an association of its clerical employees in the interests of the railroad company and in opposition to the railway clerks' labor organization—language as apposite as if the facts of the instant case were before the Supreme Court. The Chief Justice said (281 U.S. pages 559, 560, 50 S.Ct. page 430, 74 L.Ed. 1034): "Motive is a persuasive interpreter of equivocal conduct, and the petitioners are not entitled to complain because their activities were viewed in the light of manifest interest and purpose. The most that can be said in favor of the petitioners on the questions of fact is that the evidence permits conflicting inferences, and this is not enough. The circumstances of the soliciting of authorizations and memberships on behalf of the association, the fact that employees of the railroad company who were active in promoting the development of the association were permitted to devote their time to that enterprise without deduction from their pay, the charge to the railroad company of expenses incurred in recruiting members of the association, the reports made to the railroad company of the progress of these efforts, and the discharge from the service of the railroad company of leading representatives of the brotherhood and the cancellation of their passes, gave support, despite the attempted justification of these proceedings, to the conclusion of the courts below that the railroad company and its officers were actually engaged in promoting the organization of the association in the interest of the company and in opposition to the brotherhood, and that these activities constituted an actual interference with the liberty of the clerical employees in the selection of their representatives."

The National Labor Relations Act was designed to protect the basic rights of labor incidental to the practice of collective bargaining.

Section 8 of the National Labor Relations Act, relating to company-controlled unions, must not be construed so strictly or so legalistically so as to destroy its purpose or the legislative intent.

It is essential that the right of employees to self-organization and to join or assist labor organizations should be safeguarded against imposition of employer-controlled organizations, particularly where such organizations are limited to the particular employer and have no potential economic strength.

The most commonly recognized forms of employer interference have been financial support, participation in the formation of the constitution or by-laws, or in the internal management of the union, espionage, "solicitation" of employees by foremen, and the like.

As was stated in the report of the House Committee on Labor on this feature of the Act, collective bargaining is nothing less than a sham and a delusion when the employer sits on both sides of the table by reason of his domination of a particular organization with which he deals. This domination may take many forms.

An employer interferes with self-organization of his employees when he throws the great weight of his support, through permitting "solicitation" of membership of

a favored organization by foremen and assistant foremen, to the competitive disadvantage of a group of employees who want representation by an outside union. This is especially so when the foremen and assistant foremen stage a concerted membership drive, under supervision of the plant manager, in which thinly-veiled threats of dismissal are used as a "persuader."

The whole policy of the law is to redress an inequality of bargaining power by forbidding employers to interfere with the development of employee organizations, thereby removing one of the issues most provocative of industrial strife and bringing about the general acceptance of the orderly procedure of collective bargaining under circumstances in which the employer cannot trade upon the economic weakness of his employees.

█ The prohibition against the so-called company union and its domination by the employer is designed to prevent the rights of employees from being nullified by an organization which is responsive to the will and the purpose of the employer.

█ It cannot be challenged that any legislative policy must be given the most liberal interpretation, and not be narrowed down to the point of vanishment by rigid interpretation of the letter of the legislative enactment. Our National and State legislatures have recognized that in a measure labor must be protected against itself; that safeguards must be erected which will prevent the employer from disadvantageously bargaining with his employees. The Congress and our legislatures have recognized the handicap of labor in its dealings with the employer—a handicap resulting from the very nature of the labor relationship.

It is because of its recognition that the employee is sensitive and responsive to even the most subtle expression on the part of his employer, whose good will is so necessary, that limitations have been placed upon the activities of the employer in carrying out the principle of collective bargaining.

█ It is the intention of our labor legislation that labor organizations shall be truly representative of the employee's interests, and the language of Section 8 of the National Labor Relations Act pro-

hibiting domination or interference with any labor organization must be broadly interpreted so as to cover any conduct on the part of an employer which is intended to bring into being an organization which he has reason to believe will be "friendly."

█ It follows from what has been said, and from the finding that the operations of the respondent have a close, intimate and substantial relation to trade, traffic, and commerce among the several states, that the final finding of the board that "the aforementioned unfair labor practices are unfair labor practices affecting commerce, within the meaning of Section 2(6) and (7) of the Act", is proper, and it should be and is hereby maintained.

█ *The Board's order:* The order of the Board[2] requiring respondent to cease and desist from his refusal to recognize the union (Lodge 1197), and to bargain collectively with it, is justified by the findings. The order was proper and is authorized by and in consonance with the tenor and intent of the National Labor Relations Act. Section 10(c) of the Act empowers and directs the Board, in the event a respondent is found to be engaging in unfair labor practices, to issue "an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action * * * as will effectuate the policies of this chapter."

"The Board's order properly requires respondent to desist from interfering in any manner with its employees in the exercise of their right to self-organization and to bargain collectively through representatives of their own choosing." National Labor Relations Board v. Fansteel Metallurgical Corporation, supra.

Upon identical grounds we arrive at the same conclusion with regard to the order of the board that the respondent take affirmative action, to wit: bargain collectively with Lodge 1197 as the exclusive representative of all its production employees; withdraw recognition from the employees' union; and post notices disclosing its compliance with the order: see National Labor Relations Board v. Fansteel Metallurgical Corporation, supra, subdivision "Seventh" of the opinion, where it was said:

"Seventh.—The requirement that respondent shall withdraw all recognition

---

[2] The order referred to is set out in full in the Appendix attached to this opinion.

from Rare Metal Workers of America, Local No. 1.

"While respondent presents a strong protest, insisting that Local No. 1 of the Rare Metal Workers was the free choice of the employees after work was resumed, we cannot say that there is not substantial evidence that the formation of this organization was brought about through promotion efforts of respondent contrary to the provision of Section 8(2), and we think that the order of the Board in this respect should be sustained."

It is noted that paragraph 2(b) of the board's order requires respondent completely to disestablish the employees' union as the representative of the respondent's employees. An identical provision was approved by this Court in National Labor Relations Board v. Stackpole Carbon Company, 3 Cir., 105 F.2d 167, decided May 12, 1939. See also National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., et al., supra.

Brief mention may be made of the respondent's complaint that there was "prejudicial use of incompetent, irrelevant and immaterial testimony". Particular objection was expressed by the respondent against the admission of the testimony of David J. Saposs, chief economist for the National Labor Relations Board, who was called as an expert by the petitioner. His testimony was on the subject of "the process of collective bargaining."

There is no merit to this objection.

In National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., et al., supra (303 U.S. page 267, 58 S.Ct. page 574, 82 L.Ed. 831, 115 A.L.R. 307), Mr. Justice Stone, in a footnote, cited numerous experts and text books "on the significance of recognition in collective bargaining." One of the expert authorities cited by Mr. Justice Stone was the 20th Century Fund, Inc. Mr. Saposs was a research associate with the 20th Century Fund, Inc. Nothing further need be said on this score.

As was stated in Consolidated Edison Company et al. v. National Labor Relations Board, supra (305 U.S. page 229, 59 S.Ct. page 217, 83 L.Ed. 126): "The companies urge that the Board received 'remote hearsay' and 'mere rumor'. The statute provides that 'the rules of evidence prevailing in courts of law and equity shall not be controlling' (Section 10(b); 29 U.S.C. § 160(b), 29 U.S.C.A. § 160(b)).

The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. Interstate Commerce Commission v. Baird, 194 U.S. 25, 44, 24 S.Ct. 563, 568, 48 L.Ed. 860; Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 431; United States v. Abilene & Southern R. Co., 265 U.S. 274, 288, 44 S.Ct. 565, 569, 68 L.Ed. 1016; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 442, 50 S.Ct. 220, 225, 74 L.Ed. 524 * * *." See also National Labor Relations Board v. Falk Corporation, 7 Cir., 102 F.2d 383 (March 7, 1939).

The evidence and the entire record in this case, as well as the arguments advanced by respondent's own counsel in this appeal, indisputably demonstrate a regrettable attitude of the respondent toward the National Labor Relations Act. Respondent failed utterly to discharge its duty to bargain with the Lodge, as the representative of the majority of its employees, in good faith. It is clear that the respondent at no time during its negotiations with its employees entertained any intention of entering into an agreement with the Lodge as the bargaining unit, as provided by the National Labor Relations Act. It is obvious that an employer who enters into negotiations with a labor union representing his employees, with his mind hermetically sealed against even the thought of entering into an agreement with the union, is guilty of refusing to bargain collectively with the representatives of his employees in good faith, as required by the Act, and is therefore guilty of an unfair labor practice. The studied and meticulous efforts of the respondent, in the course of its negotiations with its employees, and in its relationship with its own dominated union, to be "within the law," tell their own story. Duties imposed by law cannot be discharged by offering shadow for the substance. The Board's order is valid. It is supported by the record, and must be given effect.

Accordingly, a decree enforcing it will be entered.

## APPENDIX

### Order of the National Labor Relations Board

On the basis of the above findings of fact and conclusions of law, and pursuant

to Section 10(c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that The Griswold Manufacturing Company, its officers, agents, successors, and assigns, shall:

1. Cease and desist:

(a) From refusing to bargain collectively with Amalgamated Association of Iron, Steel and Tin Workers of North America, Lodge No. 1197, as the exclusive representative of all its production employees, except clerical and office employees, foremen and supervisory employees, and watchmen;

(b) From dominating or interfering with the administration of the Employees' Union of The Griswold Manufacturing Company, or with the formation and administration of any other labor organization of its employees, and from contributing support to the Employees' Union of The Griswold Manufacturing Company, or to any other labor organization of its employees;

(c) From in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining, or other mutual aid and protection, as guaranteed in Section 7 of the Act.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Upon request, bargain collectively with the Amalgamated Association of Iron, Steel and Tin Workers of North America, Lodge No. 1197, as the exclusive representative of all its production employees, except clerical and office employees, foremen and supervisory employees, and watchmen, in respect to rates of pay, wages, hours of employment, and other conditions of employment;

(b) Withdraw all recognition from the Employees' Union of The Griswold Manufacturing Company as representative of its employees for the purposes of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and completely disestablish the Employees' Union of The Griswold Manufacturing Company as such representative;

(c) Post immediately notices to its employees in conspicuous places throughout its plant, and maintain said notices for a period of thirty (30) consecutive days, stating (1) that the respondent will cease and desist as aforesaid, and (2) that the respondent withdraws and will refrain from recognition of the Employees' Union of The Griswold Manufacturing Company as a representative of its employees for the purpose of dealing with respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and completely disestablishes it as such representative;

(d) Notify the Regional Director for the Eighth Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith.