## NATIONAL LABOR RELATIONS BOARD v. GEORGE P. PILLING & SON CO.

### No. 7524.

Circuit Court of Appeals, Third Circuit.
March 18, 1941.

Robert H. Kleeb, of Pittsburgh, Pa.
(Charles Fahy, Gen. Counsel, Robert B.

Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Joseph Friedman, and Margaret Holmes McDowell, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for petitioner.

Joseph J. Brown, of Philadelphia, Pa. (John Arthur Brown and D. Alexander Wieland, all of Philadelphia, Pa., on the brief), for respondent.

Before CLARK, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

This matter is here upon petition of the National Labor Relations Board for the enforcement of its order against the respondent in a proceeding duly had under the National Labor Relations Act.[1] The order, which is based upon cognate findings by the Board, directs the respondent to cease and desist from refusing to bargain collectively with its employees, to take appropriate action in such regard for the future and to post notices indicating its intention to comply with the order. By answer filed, the respondent alleges that the Board erred in concluding that the respondent refused to bargain collectively and that, in any event, the respondent can no longer be required to bargain collectively with its employees' designated agent as the latter has undeniably ceased to represent a majority of the employees in the particular unit. Wherefore, the respondent prays that the order be denied enforcement and that it be set aside.

The principal question here involved is whether the Board's findings that the respondent engaged in unfair labor practices in violation of Sec. 8(1) and (5) of the Act are supported by substantial evidence. The remaining question with respect to the representative status of the employees' bargaining agent is but incidental and, in any view, without controlling effect upon the main question for determination. If the respondent was not guilty of the unfair labor practices charged, then the basis for the Board's order, which includes the direction that the respondent bargain collectively with the particular bargaining agent, necessarily falls; but, if, on the other hand, the respondent engaged in unfair labor practices, as the Board found, then the asserted loss of the bargaining agent's majority support is presently im-

material to the Board's exercise of its discretion in dissipating the unfair labor practices.

The respondent argues that it endeavored faithfully at all times to negotiate with its employees' bargaining agent and that the failure to arrive at an agreement by collective bargaining was the fault of the bargaining agent and not of the respondent. This contention rests upon the conclusions which the respondent would have us draw from the testimony as opposed to those actually deduced by the Board. It is not our province, however, to choose one inference or conclusion in preference to another. Our power is limited by the Act to determining whether there is substantial evidence to support the Board's findings and whether the directions embodied in the Board's order are legally appropriate for the correction of the conditions found. Sec. 10(e); National Labor Relations Board v. Bradford Dyeing Association (U.S.A.) et al., 310 U.S. 318, 342, 60 S.Ct. 918, 84 L.Ed. 1226. So viewing the record in this case, we are of the opinion that the Board's findings are supported by substantial evidence.

George P. Pilling & Son Co., the respondent, is a Pennsylvania corporation engaged in the manufacture and sale of surgical instruments at its plant in the City of Philadelphia, where it employs slightly more than one hundred persons. The Board found, and it is not disputed, that the respondent's hourly-rate and piece-rate production employees, exclusive of superintendents, clerical employees and sales people, constituted an appropriate unit for the purposes of collective bargaining. There are approximately one hundred such production employees.

The respondent conceded at the hearing that it "is engaged in interstate commerce, within the meaning of the Act". This concession, of course, would go no further than to indicate the absence of any controversy as to the Board's jurisdiction which was otherwise fully established by the proven facts with respect to the character of the respondent's business. From the testimony of the respondent's president, the Board correctly found that any interruption of the respondent's business because of labor disputes would directly impede the free flow of interstate commerce. Hence, the respondent's amenability to

[1] 49 Stat. 449, c. 372, 29 U.S.C.A. §151 et seq.

the provisions of the Act followed as a matter of law. National Labor Relations Board v. Bradford Dyeing Association (U. S. A.) et al., supra, 310 U.S. at pages 324–326, 60 S.Ct. 918, 84 L.Ed. 1226; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 604, et seq., 59 S.Ct. 668, 83 L.Ed. 1014; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 463, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 31, 32, 57 S.Ct. 615, 81 L.Ed. 893, 108 A. L.R. 1352.

As a result of organizational activities begun among the respondent's employees in May 1937 by the Dental, Surgical & Allied Workers Local Industrial Union No. 119, a C. I. O. affiliate, a meeting was held at which a shop committee was selected from among the respondent's employees, consisting of Lerman, Smith, Cherry and White. Early in June, Lerman, who was most active in obtaining union members, called a meeting of the older employees for the noon hour on an upper floor of the respondent's plant. As Lerman testified, the older men, while sympathetic to collective bargaining, were hesitant to join the union lest they be "left holding the bag", that is, lose their jobs, if the attempt at unionization should fail. Before any definite expression could be obtained at this meeting, the time came for the employees to return to work.

The same afternoon, a notice was posted on the bulletin board in the plant announcing a meeting of all employees after working hours on an upper floor of the plant at which George Pilling, the respondent's president, would speak. The notice also invited expression at the meeting of any grievances on the part of the employees. Peters, the plant superintendent, opened the meeting and introduced Pilling. The Board found, and there is direct testimony to support the findings, that Pilling then said that "he was not going to have any union run his business for him"; that "he made the statement that if * * * [the employees], would proceed with the union organization, * * * he would close the plant down or severely curtail the activities of the plant by laying the men off and buying his instruments in Germany, and to substantiate that statement * * *, he had a big catalogue of German goods on the table, which he opened up and showed to the men

all the types of German instruments that were being manufactured, and that he could get"; and he then "singled out certain men", one of whom was John Bennett, "one of the oldest men there", and "asked him how old he was, and, in a roundabout way, he came to the point, it would be pretty hard for him [Bennett] to get a job if he lost his job". Pilling concluded by saying "that he was always ready to listen to grievances; that his office was always open. * * * [and] if anybody had any grievances, right then and there, they should tell him". Thereafter, Harper, the foreman of the tool room, tried to impress upon Lerman that there was no need for a union in the plant and that the employees could always settle their complaints by just telling Pilling or Peters about them.

The respondent argues that Pilling's hostility to his employees' exercise of their right to self-organization was purged by his later agreeing to bargain with the union as his employees' representative if it was the choice of a majority of the employees. However, Pilling's plainly expressed attitude against union representation of his employees is not without evidentiary value both upon a question of the violation of the employees' freedom of choice and upon a consideration of subsequent events in their bearing on the Board's findings.

Several days after the meeting called by Pilling to which we have just referred, and when a majority of the respondent's employees had become members of the union, they instructed one Cort, a business agent for the union, to arrange a conference with the respondent for the negotiation of a contract with respect to wages, hours and working conditions. Accordingly, Cort wrote the respondent on June 18 requesting a conference for the following Monday (the 21st) and stating that he would telephone at 10 A.M. Monday to confirm the arrangement. When Cort telephoned, he was told that Pilling would have to take the matter up with the board of directors and that nothing could be done until after Wednesday. Cort, warning that Pilling would be responsible for the consequences due to further delay in commencing the negotiations, urged that a conference be arranged for that day or the next. Pilling said that that could not be done and so terminated the conversation. A few minutes after noon of the same day, Smith, a

member of the shop committee, called Cort on the telephone and was informed of Pilling's answer. Within a half hour, Lerman called Cort and told him that the employees were not satisfied with Pilling's answer and had gone out on strike. Cort went to the plant and, finding about sixty-three employees on strike, began to organize a picket line. Pilling, upon Cort's being identified as the representative of the union, refused to shake hands with him when Smith sought to introduce them.

That afternoon (June 21) Cort wrote the respondent setting forth the items which the union desired to have incorporated in a contract; and the next day Pilling wrote Cort offering to meet in the afternoon of the succeeding day. The meeting was held at the appointed time on June 23, those present being Pilling and attorneys for the company, and Smith and Cherry, shop committeemen, and Cort for the union. One of the respondent's attorneys told Cort at the meeting that he saw no reason for not negotiating if the union would produce proof of its majority support. Pilling, however, renewed his threat to close the plant and to import goods from Germany, exhibiting to Cort the catalogue of German goods. It was then that Cort suggested an election by the employees under the supervision of the Board to determine whether they desired the union as their bargaining agent. Another conference was held two days later at which Pilling signed a statement declaring that the respondent would bargain with the representative designated by a majority of the employees and that any agreement arrived at between the respondent and the bargaining agent would be committed to writing. Immediately thereupon (Friday, June 25) Cort informed the striking employees that the respondent had agreed to an election and they promptly voted to return to work the following Monday, June 28. On June 29 one of the attorneys, acting for the respondent, signed an agreement in its behalf for a consent election by the employees, which was held on July 6. Of the one hundred one employees eligible to vote at the election, ninety-nine actually participated therein, with the result that fifty-one cast their ballots in favor of the union as their bargaining representative and forty-seven against, the ballot of one employee apparently not having been recorded.

Following the election of the union as the employees' bargaining agent, a conference was arranged for July 13, which was attended by one of the attorneys for the respondent and Peters, the superintendent, and by Cort for the union. Pilling did not attend. The attorney told Cort that neither he nor Peters was authorized to bind the company. Nevertheless it was decided that the items for a proposed contract, as suggested by Cort, should be discussed. The attorney informed Cort that Pilling would not agree to a closed shop; and Cort then suggested a preferential-shop clause in its stead. The respondent's attorney and Cort differ as to what was then said concerning the preferential-shop provision. The attorney testified that he told Cort at that time that the respondent was not in position to agree to the preferential-shop clause, while Cort testified that the attorney tentatively agreed to the preferential-shop provision. When the attorney for the respondent objected to the check-off system proposed by Cort, the latter suggested that the shop chairman collect dues on company property but not during working hours, and both the attorney and Peters tentatively agreed to this suggestion. There was also tentative agreement upon Cort's request for a forty hour week of five days and time and one-half for overtime. Several other items proposed by Cort were also discussed with tentative agreement between the parties upon some of the items.

Three days later (July 16) another conference was held, which Pilling did attend. The provisions for a proposed contract as submitted by Cort and as amended tentatively at the prior conference were read and explained to Pilling, item by item. As each item was read Pilling was asked whether he would agree and in each instance answered "No". At no time did he explain his views or make any counterproposal or suggestion. Shortly prior to this meeting Lerman had been discharged and two other employees had been put on part time work. On the afternoon of this same day the respondent posted on the bulletin board in its plant a notice addressed to its employees. The notice contained an argument in support of the respondent's opposition to the union's demand for a preferential shop and concluded with the statement,—"We [the management] will do our best to raise wages whenever possible

and we are endeavoring to work out a schedule of shorter hours without reduction of wages. We intend to carry on business and operate the plant as long as we are able to do so. If we are obliged to close the factory it will be because of conditions over which we have no control." The implication of this notice, which was presumably its intent, is obvious. Ten days later (July 26) the respondent similarly posted another notice addressed to its employees. After referring to the statement in the earlier notice with respect to the company's desire to shorten hours and to advance the hourly rate of pay, the later notice stated that,—"This plan has been nearly completed, and we hope to put it into effect the week beginning August 4th, unless prevented by conditions over which we have no control." A description of the plan then followed and a statement that in operation it would be equivalent to an increase in wages of twelve and one-half per cent. This action on the part of the respondent was entirely unilateral. The union had not been consulted with respect thereto, although the matter had been urged by Cort upon the respondent from the time of the first conference following the union's designation as bargaining agent.

Three or four months then elapsed, during which, apparently, nothing further was done looking to bargaining collectively. Cort says that he called the respondent's attorney a number of times, trying to arrange conferences which were never granted. On the other hand, the attorney denies failure on his own or the respondent's part in such regard and says that an impasse had been reached in the conferences between the bargaining agent and the respondent and that it was so recognized by both sides. In any case, Cort wrote to the respondent's attorney on March 25, 1938, urging a further conference and stating that the employees were asking for results. As a consequence, the respondent's attorney and Pilling met with Cort on April 1. Pilling then told Cort that if he would organize the rest of the industry, Pilling would do business with him. It should be recalled that, nine months earlier, Pilling had signed a paper agreeing to bargain with the representative selected by a majority of his employees. The attorney testified that he told Cort that the respondent would deal with the union and that the union's demand for a preferential shop and check-off furnished the only

serious cause for difference. The attorney admitted, however, that when Cort asked him to suggest an alternative to the preferential shop, he did not do so. In fact that was never done by anyone acting for the respondent.

Several more conferences were held thereafter but always with like result as before. At one of those conferences (on May 12) when Cort tried to discuss with Pilling one of the proposed clauses, the latter refused to do so unless Cort first told him the names of the members of the shop committee. This, Cort refused to do. On May 27 Cort wrote to the respondent's attorney threatening to file charges against the respondent with the Labor Board. The attorney responded by two letters (May 31 and June 1) saying that he was endeavoring to bring the matter to a conclusion as promptly as possible; but, on June 6, the attorney informed Cort that Pilling had received a petition on May 26 which was signed by eighty of the employees and in which they indicated that they were thereby withdrawing the union as their bargaining agent and desired a new election.

Agitation among the employees for a swing away from the union had been instigated about the middle of May, 1938, when approximately twenty of the employees met and discussed the situation with regard to the negotiations between the respondent and the union. Another meeting was called for a few days later, which was attended by approximately eighty of the employees. At this meeting one Todt, who from the first had opposed the union, did most of the talking. He admonished the employees that the union was unable to do anything for them,—a point then not difficult to impress considering that the union members were already fully cognizant of the situation from Cort's recurrent reports at union meetings. After telling the employees that they were "not getting anywhere" and were "not benefiting" under the union, Todt then appealed to them on the basis that it was only by their submission to Pilling's will that their economic interest would be served. Observing that the employees were then working only part time but were anxious to go back on full time, Todt told them that if they would sign the petition and thus give Pilling confidence,—"he [Pilling] would put us [the employees] back on forty hours". The evidence further plainly shows that the cause for the

employees' dissatisfaction with the union was its inability to procure a contract for them with the respondent. As testified to by one of the signers of the petition,— "They [the employees] were all basing their hope on a contract". They wanted "something to work on". The fact that a contract had not been signed was not unimportant in the formulation of employee opinion with respect to the advisability of continuing the union as bargaining agent and, obviously, who was responsible for the failure to bargain is of first importance.

After the employees had signed the petition in ostensible repudiation of the union as bargaining agent and had so notified Pilling, further conferences between the respondent and the union were held down to mid-July, 1938. But, upon each of these occasions Pilling asserted that he was no longer obliged to negotiate with the bargaining agent. And, as a consequence, no agreement was arrived at. Then followed the Board's complaint, the hearing and the Board's decision and the order now here on petition for enforcement.

The facts in the case fully justified the Board's findings that the respondent refused to bargain collectively with the union on July 16, 1937, and at all times thereafter, and that the union's apparent loss of majority support in May of 1938 was the result of the respondent's antecedent and persistent unfair labor practices.

Bargaining presupposes negotiations between parties carried on in good faith. The fair dealing which the service of good faith calls for must be exhibited by the parties in their approach and attitude to the negotiations as well as in their specific treatment of the particular subjects or items for negotiation. For such purpose, there must be common willingness among the parties to discuss freely and fully their respective claims and demands and, when these are opposed, to justify them on reason. When the proffered support fails to persuade or if, for any cause, resistance to the claim remains, it is then that compromise comes into play. But, agreement by way of compromise cannot be expected unless the one rejecting a claim or demand is willing to make counter-suggestion or proposal. And, where that is expressly invited but is refused, in such circumstances the refusal may go to support a want of good faith

and, hence, a refusal to bargain. These considerations are especially applicable to negotiations looking to collective bargaining and have been so regarded by the courts. See Agwilines, Inc., v. National Labor Relations Board, 5 Cir., 87 F.2d 146, 153; National Labor Relations Board v. Sands Mfg. Company, 6 Cir., 96 F.2d 721 725, affirmed 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 103 F.2d 91, 94; National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 723; National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 637; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 787. See also Teller on Labor Disputes and Collective Bargaining, Vol. 2, § 329.

In the light of these principles, the Board was fully justified under the facts of this case in concluding that Pilling's actions "clearly indicate his intention not to bargain with the union". Even if his real intention was, in fact, otherwise, it was uniformly and effectively belied by his conduct. And, in any case, good intentions alone would not be sufficient to save him from the certain consequences of his deliberately chosen course. As was said by this court in the Griswold case, supra, 106 F.2d at page 723, he entered the conference "with his mind hermetically sealed against even the thought of entering into an agreement with the union". He persisted in giving an abitrary "No", or an equivalent answer, to the union's suggestions for contract clauses, never once making any counter-suggestion or proposal, although expressly bidden by the union representative to do so. Cf. Globe Cotton Mills v. National Labor Relations Board, supra. He sought to put the bargaining agent in the impossible position of meeting objections which he purported to entertain but would not disclose, in the evident hope that he might thus fasten upon the union responsibility for his own failure to negotiate.

Pilling's attitude was all the more effectual in its dominance because he alone of those who appeared for the respondent at the conferences was empowered to bind the company. What had been acceptable to the union representative on the one hand and to the respondent's attorney and its plant superintendent on the other, Pilling repudiated in toto upon his subsequent ap-

pearance at conference. The record discloses that the respondent's attorney made sincere effort to have the parties discuss their points of difference, but Pilling continued adamant in his refusal to treat sympathetically with any of the union's proposals. And, of course, the attorney's want of any authority to bind the respondent was always present. His status, as well as that of the plant superintendent, had been made manifest at the first meeting. The very contrast between the conduct of the respondent's attorney and Pilling makes the presence, the degree and the finality of the latter's unrelenting refusal to bargain collectively stand out revealingly.

In addition to the respondent's refusal to bargain collectively as evidenced by Pilling's attitude and conduct at conference, the respondent was guilty of other unfair labor practices subsequent to the employees' selection of their bargaining agent which further serve to confirm the respondent's intent not to bargain with the union. On the afternoon of the day of the first conference which Pilling attended, he caused the notice to be placed on the bulletin board which contained matter derogatory to the union's purpose and effort, as appraised by Pilling, and also a proffer of shorter hours without loss of pay, as the voluntary contribution of the employer. This was followed shortly (no further conferences having intervened) by the like notice in which the respondent stated that the plan for shorter hours would be put into effect a few days later. Under Sec. 9(a) of the National Labor Relations Act, the matter was peculiarly a subject for collective bargaining. Yet, the respondent purposely circumvented the union with which, as the accredited bargaining agent, it was not only under a statutory duty to bargain collectively but with which the respondent had engaged in writing but a few weeks previously that it would so bargain. This action of the employer in an apparent effort to settle unilaterally a matter with respect to which the employees had appropriately requested collective bargaining amounted to a violation of Sec. 8(5) of the National Labor Relations Act. See M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 432, 435; National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 478. Furthermore the notices in and of themselves constituted an effort on the part of the respondent to undermine the bargaining authority of the union in violation of Sec. 8 (5). Cf. National Labor Relations Board v. Lightner Publishing Corp., 7 Cir., 113 F.2d 621, 625; National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 111 F. 2d 681, 686, 687.

The same may be said for Pilling's requirement, as a condition precedent to the respondent's bargaining with the union, that the latter first organize the industry in general, and later, that Cort, the union's representative, make known to Pilling the names of the members of the shop committee. Sec. 7 of the Act guarantees to the employees the right to bargain collectively through a representative of their own choosing and it is not for the employer to restrain or interfere with the exercise of that right by insisting upon unwarranted conditions. See In the Matter of Lane Cotton Mills and Textile Workers Organizing Committee, 9 N.L.R.B. 952, 968, enforced in National Labor Relations Board v. Lane Cotton Mills Co., 5 Cir., 111 F.2d 814.

As justification for the respondent's refusal to bargain collectively, it assigns (1) the union's demand, first, for a closed and, later, a preferential shop and (2) the bargaining agent's loss of majority support. The first of these reasons was patently a pretext. The avidity with which Pilling seized upon it was striking. The demand for a closed shop had never been insisted upon. In fact, it had been dropped from the union's proposals at the very first conference even before Pilling attended. And, while the preferential-shop clause, which had been proposed by Cort as a substitute, was put forward at the next succeeding conference where Pilling was present, upon his refusal to accede to a preferential shop, Cort requested a counter-suggestion which Pilling would not make. Immediately, thereupon, the notices to which we have already referred were posted by the respondent. The impasse to the negotiations which the respondent now asserts could not possibly have yet occurred. The request for a preferential-shop clause was at least germane to a discussion of conditions of employment and Pilling refused to discuss it. The mere proposal of the preferential-shop would not justify him in breaking off negotiations, at least, not at his first conference and where he offered nothing.

The Board found that the union's loss of majority was the result of the respondent's unfair labor practices, and the finding is supported by the evidence. There is direct testimony to sustain the Board's conclusion that "the petition [in repudiation of the union as bargaining agent] was directly caused by the respondent's refusals to negotiate in good faith with the Union, and the employees' attendant weariness of waiting for results".

The employees' petitioning of May 26, purporting to withdraw the union's authority as bargaining agent, was the expected harvest which the respondent reaped in due season from what it had theretofore sown and purposefully cultivated until maturity. In no event could the employer discredit a duly designated bargaining agent by refusing to bargain with it and then avail himself of the bargaining agent's loss of majority support which has thus been brought about by the employer's own conduct. National Labor Relations Board v. Bradford Dyeing Association (U.S.A.) et al., supra, 310 U.S. at page 340, 60 S.Ct. 918, 84 L.Ed. 1226; M. H. Ritzwoller Co. v. National Labor Relations Board, supra, 114 F.2d at pages 437, 438; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473, 481; National Labor Relations Board v. Somerset Shoe Co., supra, 111 F.2d at page 690; Bussmann Mfg. Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 783, 788; National Labor Relations Board v. Highland Park Mfg. Co., supra, 110 F.2d at page 640. Continuously from the time the union was selected as the employees' bargaining agent down to the signing of the petition purporting to withdraw its representative authority, the respondent refused to bargain collectively, as the Board competently found. In such circumstances, it was within the discretion of the Board in dissipating the proven unfair labor practices to require that the employer bargain collectively with the theretofore freely selected bargaining agent. International Ass'n of Machinists, Tool and Die Makers Lodge No. 35 v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 89, 85 L.Ed. ——, Oughton et al. v. National Labor Relations Board, 3 Cir., 118 F.2d 486, and cases there cited.

The Board's order will be enforced upon submission of a decree for that purpose.