## NATIONAL LABOR RELATIONS BOARD v. LIGHTNER PUB. CORPORATION OF ILLINOIS.

### No. 7164.

Circuit Court of Appeals, Seventh Circuit.

July 1, 1940.

Chas. M. Fahy, Robert B. Watts, Laurence A. Knapp, Ass't. Gen. Counsel, G. L. Patterson, Richard C. Barrett, and Harry E. Selekman, all of Washington, D. C., for appellant.

Elbridge Rice, Daniel M. Healy, and Leonard C. Reid, all of Chicago, Ill., for appellee.

Before MAJOR, TREANOR, and KERNER, Circuit Judges.

TREANOR, Circuit Judge.

This case is before us upon the petition of the National Labor Relations Board for a decree of enforcement of the Board's order which was issued against the respondent, Lightner Publishing Corporation of Illinois, under the authority of Section 10(c) of the National Labor Relations Act.[1]

Chicago Typographical Union No. 16 and Chicago Printing Pressmen's Union No. 3 filed a complaint against the respondent alleging that the Unions represented a majority of respondent's employees in units appropriate for collective

[1] 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

bargaining and charging that respondent had refused to bargain with the Unions. The complaint further alleged that because of respondent's refusal to bargain collectively its employees went on strike on September 30, 1937; that from October 25, 1937, to the date of the issuance of the complaint, respondent had endeavored to dissuade its employees from retaining membership in said Union and had urged and solicited some of its employees to abandon their Union activities and to return to work as individuals and not as members of the Unions; and that the respondent threatened to cease operations of the plant if the employees remained members of the Unions. The complaint further alleged that by the enumerated acts respondent had engaged in, and was engaging in, unfair labor practices within the meaning of Section 8(1) and (5) and Section 2(6) and (7) of the Act.

The respondent's president, O. C. Lightner, by letter to the Board, denied that respondent had engaged in unfair labor practices and stated that respondent did not intend to retain counsel and would not appear at the hearing. Respondent did not appear at the hearing although it filed with the Board a letter excepting to the intermediate report of the trial examiner. Respondent was notified that it had the privilege of applying for oral argument before the Board but respondent did not do so. On May 26, 1939, the Board issued its decision in which was set forth its findings of fact, conclusions of law, and its order based thereon.

The Board found that the respondent had refused to bargain collectively with the representatives of its employees and, thereby, had committed an unfair labor practice within the meaning of Section 8(5); the Board also found that the respondent had interfered with, restrained and coerced its employees in the exercise of the rights guaranteed by Section 7 of the Act and thereby had committed an unfair labor practice.

The Board also found that the strike of the respondent's employees, which began September 30, 1937, was caused by respondent's refusal to bargain collectively.

A portion of the Board's order is based on the Board's finding that the respondent refused to engage in collective bargaining with the Unions prior to the calling of the strike, and upon the further finding that the strike resulted from respondent's refusal to engage in collective bargaining.

It is clear that there was no direct refusal to bargain with the committee as the representative of respondent's employees prior to the beginning of the strike on September 30, 1937. It is the contention of the Board, however, that the evidence was sufficient to justify an inference that the respondent was not acting in good faith with the representatives of its employees and that respondent had a "preconceived intention of evading" its obligation under the Act.

There is no conflict in the testimony respecting the reaction of Mr. Lightner, as the representative of respondent company, during the two conferences which were held prior to the strike on September 30. The evidence consists of the testimony of members of the bargaining committee. When the committee informed Mr. Lightner at the conference on September 20, 1937, that it represented the men working in the press room and "would like to do a little collective bargaining", and offered to show the evidence of their authority, Mr. Lightner waived aside the evidence of authority with the remark that "there wasn't anything he could do about it." But Mr. Lightner did not question the authority of the committee to represent the employees and there is no evidence to indicate that the failure to negotiate an agreement was due to Mr. Lightner's refusal to recognize the committee as the bargaining agent of his men. While no satisfactory progress was made during this first meeting the committee did succeed in proposing to Mr. Lightner that the respondent adopt the "step rate" system. The adoption of this system meant an eventual, but gradual, increase in prices and Lightner stated that he did not want to increase his prices. When the committee left it was understood that there would be another conference in about a week. The committee requested Mr. Lightner to think over the "step rate" system proposition and he replied that his mind "would be the same then as it is now." The following conversation then took place:

(Committee) "You think it over. Maybe there will be a little change come over you."

(Mr. Lightner) "All right."

The testimony reveals that Mr. Lightner was opposed, unqualifiedly, to an increase

in wages; but in support of this position he stated that he "wasn't making any money in the printing business and all the money he was making he was giving to the employees and he wasn't taking any, not one red cent, out of the business." And it is obvious that the committee contemplated a continuation of negotiations with Lightner.

Prior to the second meeting, which occurred on the 29th of September, the employees of respondent held a meeting and authorized a strike if their representatives should fail "to reach an agreement." At the meeting between the committee and Mr. Lightner on the 29th of September no progress was made toward an agreement; and, according to the testimony of members of the committee, Mr. Lightner "had nothing else to say * * * different than what he told us at the first meeting." During this meeting Mr. Lightner expressed the belief that his competitors were "sicking the union on to him"; and he was of the opinion that "if the government would only let them run their own affairs, if they let business run their own affairs this country would be a whole lot better off." It is clear that Lightner attributed, in part at least, the unsatisfactory condition of respondent's business to governmental interference; but the reasonable inference from his remarks is that respondent's refusal to agree to an increase in wages was predicated upon the financial condition of its business rather than upon resentment against its competitors or disagreement with the policy of the government. If any factual inference respecting Lightner's mental state can be drawn from his belief that his competitors were "sicking the Union on to him", the rational inference would be that he suspected the good faith of the Union rather than that he was bargaining in bad faith.

The Supreme Court in National Licorice Co. v. National Labor Relations Board, March 4, 1940, 60 S.Ct. 569, 574, 84 L.Ed. ——, recognized that an employer may be chargeable with a refusal to bargain collectively despite continued participation in negotiations. The Supreme Court stated in its opinion that "there was * * * evidence from which the Board could have found that the negotiations * * * were not entered into by [respondent] in good faith, and were but thinly disguised refusals to treat with the Union representatives." And in National Labor Relations Board v. Griswold Mfg. Co.[2] the Circuit Court of Appeals for the Third Circuit pointed out that an employer who merely goes through the form of negotiation "is guilty of refusing to bargain collectively with the representatives of his employees in good faith, as required by the Act, and is therefore guilty of an unfair labor practice." But in the National Licorice case the evidence which was the basis of the statement of the Supreme Court disclosed that the employer was circulating a petition among its employees to nominate a committee to act as their collective bargaining representative; and that the employer's president refused to recognize the committee as the bargaining representative of all the employees and declared that he would negotiate with it as the bargaining representative only of the union members. The statement of the Third Circuit Court of Appeals in the Griswold case was not based upon any factual situation but was a general statement of the view of the court on the question.

In the instant case the testimony discloses that respondent, through its president, did not question the right of the committee to represent all of the employees; and there is no testimony tending to show that the reactions of Lightner were influenced in the slightest by any question of the right of the committee to bargain collectively for the employees. Certainly, at the close of the first meeting, the bargaining committee did not understand that further negotiations would be fruitless since the committee left its proposition with Mr. Lightner and departed with the understanding that there would be another meeting in about a week. Also, it is not without significance that the employees of respondent authorized the calling of a strike if the bargaining committee should fail to reach an agreement with respondent. This meeting was held prior to the conference of September 29, and the authorization to call the strike is conditioned upon failure to reach an agreement and not upon refusal of respondent to bargain. Neither the employees of respondent nor the members of the bargaining committee considered the conduct of respondent to constitute a refusal to bargain prior to the meeting of September 29.

The committee returned on the 29th of September and the discussion took much

---

[2] 106 F.2d 713, 723.

the same turn as it had taken at the first meeting. Finally the committee informed Mr. Lightner that it had a "mandate from the men to withdraw them" if the committee could not come "to some understanding in behalf of the men." Mr. Lightner's answer was as follows: "Well, go ahead and withdraw them. There isn't anything I can do. If the Union wants to pay the men to go out and walk on the street that's entirely up to the men." The committee then withdrew the men.

■ On October 7 a conference was held between the Union representatives and Lightner. At this conference the Union representatives urged that there be some adjustment of the controversy and that the men go back to work. Mr. Lightner stated at the conference that somebody had told him that one of the men on strike had called him a dirty name, that somebody else had told him that one of the men had threatened to throw a brick through the window. Also, Mr. Lightner stated that he didn't like the general disposition of another employee and "in that case he couldn't see where it would be humanly possible for him to put these men back to work." The Board interprets "these men" to mean all of the men on strike. Such an interpretation is strained and is not a reasonable one. We think it is clear that "these men" referred to the three men who were the subjects of Lightner's comments. Consequently, the remarks of Lightner did not constitute an arbitrary refusal to negotiate further respecting the return to work of the men. At this meeting Lightner reiterated his former statement that he could not afford to increase the wages of the men; also, he submitted his income tax reports, and stated that he was losing money on the publication. In response to the question whether Mr. Lightner made any proposal for ending the difficulty and taking the men back the witness replied, "He made no definite proposal at all." But the committee's only definite proposal was that respondent adopt the step-rate system; other terms or conditions of employment were not suggested.

■ We are of the opinion that there is no substantial evidence to support a finding that respondent had refused to bargain collectively, within the meaning of the Act, prior to the close of the meeting of October 7. Moreover, there was no

basis in the evidence for a finding that the strike of September 30 was caused by respondent's refusal to bargain in good faith. The basis of the authorization of the strike by the employees of respondent is perfectly clear. There is no dispute about the language of the authorization; and when the committee announced to Mr. Lightner that it had a "mandate from the men to withdraw them" the committee stated that the condition of withdrawal was a failure to come "to some understanding in behalf of the men." In short, the strike was authorized, and was called, because of the failure of the committee and Mr. Lightner to come to an agreement and not because of a refusal of Mr. Lightner to bargain collectively. In our opinion there is no evidence in the record to explain the Board's refusal to accept the employees' statement of their reason for striking.

The strike of September 30 was the result of a labor dispute and was not caused by an unfair labor practice.

■ On October 25 Mr. Lightner wrote letters to certain of the men who were on strike which indicated that he had abandoned any intention of negotiating with the representatives of his employees and that he was intending to negotiate with certain individuals. Also, it is clear from the letters that the terms proposed were inconsistent with the employees' membership obligations to the Union. The Board was justified in finding that respondent was chargeable with the unfair labor practice of refusing to bargain collectively from and after October 25 at the latest; and with interfering with the exercise of his employees' rights under Section 7 of the Act.

■ The Supreme Court definitely decided in National Labor Relations Board v. Mackay Co.[3] that strikers remain employees under Section 2(3) of the National Labor Relations Act, 29 U.S.C.A. § 152 (3), for the purposes of the Act; and that strikers are protected against the consequences of unfair labor practices occurring after the commencement of the strike. The foregoing is true even if the employer has not been guilty of any unfair labor practice prior to the strike, provided, the strike is a consequence of, or in connection with, a current labor dispute as defined in the Act. The Supreme Court states the meaning of the Act as follows: "The

---

[3] 304 U.S. 333, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381.

626

plain meaning of the act is that if men strike in connection with a current labor dispute their action is not to be construed as a renunciation of the employment relation and they remain employees for the remedial purposes specified in the act."

In the Mackay case a strike was called in connection with a labor dispute. Later the strike was called off and the unfair labor practice involved in the case consisted of discrimination in the reinstatement of some of the strikers. The Supreme Court held that the Labor Board, under its statutory power to grant remedial relief to effectuate the purposes of the Act, has authority to order reinstatement of the men who have been discriminated against by the employer. In Black Diamond S. S. Corp. v. National Labor Relations Board[4] the employees went on strike in connection with a labor dispute and prior to the commission of an unfair labor practice by the employer. On December 31, 1936, the demand was made upon the employer to reinstate the employees on strike, and in January, 1937, the strike was called off. The Board found that the employer had committed an unfair labor practice on December 14, 1936, by a refusal to bargain with the representatives of the employees. The Circuit Court of Appeals upheld an order of the Board which directed reinstatement of employees and required the "dismissing if necessary engineers employed since December 14, 1936." The Court of Appeals, in its opinion, stated that "from the date of the respondent's first unfair practice, its ordinary right to select its employees became vulnerable"; and that, "accordingly it was proper for the Board to order it to discharge all engineers hired for the first time since December 14, 1936 * *."

We are of the opinion that in the instant case there is no substantial evidence to support a finding that the respondent committed an unfair labor practice prior to October 25, 1937. Under the authority of the Mackay case, supra, the respondent's right to employ men to take the place of the striking employees was unqualified until the commission of the unfair labor practice of October 25, 1937. Consequently, any order of reinstatement predicated upon an unfair labor practice cannot require dismissal of men, who were employed prior to the unfair labor prac-

tice. As stated in the Mackay case "* * it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers." And the Court further stated that the employer "is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them."

It follows from the foregoing that in the instant case the order requiring the discharge of men hired after the calling of the strike on September 30, 1937, if such discharge is necessary for purposes of reinstating the striking employees, must be modified by substituting October 25, 1937, the date of the first unfair labor practice shown by the evidence for September 30, 1937, the date of the beginning of the strike.

Since there was substantial evidence to support the finding that the respondent committed the unfair labor practices in question on and subsequently to October 25, 1937, the cease and desist portion of the order of the Board rests upon a valid finding of fact.

The Board urges that certain statements in respondent's publications indicate a lack of good faith on the part of respondent in his negotiations with the bargaining agents; and respondent complains that the use as evidence of articles written by Lightner which appeared in respondent's publications constitutes a violation of respondent's right of free speech. The articles in question expressed the views of the writer respecting the National Labor Relations Board, governmental policies in general, economic question, and the evil of racketeering in labor organizations. There were a few references to the controversy between respondent and its employees.

No expression of an employer's opinion, as such, on any subject can constitute an unfair labor practice; and obviously the National Labor Relations Board has no authority to interfere with an employer's untrammeled expression of views on any subject. We assume, however, that statements either of an employer or of employees, which are relevant to a pending controversy, may be utilized as evidence. Statements of employers have

4 2 Cir., 94 F.2d 875, 879.

been treated as evidence of interference with the exercise of the employees' rights under the Act. But as a general rule, statements of employers or of employees can have no rational probative force as evidence in a proceeding before the National Labor Relations Board except when such statements relate directly to a factual issue before the Board.

The statements in question in this case were not directed to employees but to the readers of the publications of respondent. The record indicates beyond question that these statements appeared in print a considerable length of time after the commission of the unfair labor practices. We are convinced that they afforded no substantial evidence of respondent's bad faith at the time that he was meeting with the representatives of his employees.

Furthermore, we feel that by the Board's own action the articles in question were before the Board only as evidence that the respondent was engaged in interstate commerce. The record contains the following entry:

"Mr. Reynolds. (Attorney, National Labor Relations Board) As further evidence bearing upon the question of the Board's jurisdiction in this case I wish to offer copies of each of the three magazines published by the Lightner Publishing Corporation, which tend to show national scope of the business of the Lightner Publishing Company, national advertising and circulation, and so forth. As Board's Exhibit No. 3, I will offer the November 1937 issue of Automatic Age; as Board's Exhibit 3-A, I offer the November 1937 issue of Hobbies; as Board's Exhibit No. 3-B, I offer in evidence January 1938 issue of All Pets Magazine.

"Trial Examiner Erickson. They may be received. (Thereupon, the magazines above referred to were marked as 'Board's Exhibits Nos. 3, 3-A and 3-B,' respectively, and were received in evidence.)"

While we realize that rules relating to evidence are relaxed in the case of administrative hearings, we are of the opinion that an exhibit introduced and accepted by the Board for a single purpose only cannot be used by the Board for an independent and unrelated purpose.

The petition of the National Labor Relations Board for an order of enforcement is granted and the enforcement of the order of the Board, as modified, is decreed.