## ATLAS UNDERWEAR CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 8568.

Circuit Court of Appeals, Sixth Circuit.

Jan. 15, 1941.

Paul Y. Davis, of Indianapolis, Ind. (Paul Y. Davis and Davis, Pantzer, Baltzell & Sparks, all of Indianapolis, Ind., on the brief), for petitioner.

Frederick P. Mett, of Washington, D. C. (Robert B. Watts, Laurence A. Knapp, Lewis M. Gill, William J. Isaacson, and Frederick P. Mett, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The cease and desist order of the respondent, issued upon charges filed by the Textile Workers Organizing Committee, now known as the Textile Workers Union of America, affiliated with the Committee for Industrial Organization, is brought here for review with the prayer that it be set aside because it is in response to findings which are not based upon substantial evidence. The respondent, in reply, prays for a decree of enforcement.

The petitioner is an Ohio corporation with a plant at Piqua where it manufactures and sells underwear, and the like, receiving much of its raw materials from without the state and shipping its finished products to other states. Jurisdiction is admitted. The Textile Workers Union of America, Local No. 187, is a labor organization having membership among the petitioner's employees, including clerical and office employees as well as those engaged in production and maintenance. Federated Industrial Union No. 210 is likewise a labor organization with membership in the petitioner's plant.

The challenged order commands that the petitioner cease and desist from dominating and interfering with the administration of F. I. U. or other labor organizations of its employees, and from contributing to their support. It directs discontinuance of espionage or surveillance, interference, restraint or coercion of the petitioner's employees, in the exercise of their rights to self-organization. It also requires, as af-

1022

firmative action, that the petitioner withdraw all recognition from F. I. U. as the representative of its Piqua plant employees for purposes of collective bargaining, its disestablishment as such representative, and the posting of the usual notices.

The Board took cognizance of the attitude of the petitioner prior to the enactment of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and prior to the events which led to charges presented to the Board, as aids to determination whether, in purpose and expected result, the several activities of the petitioner constituted unfair labor practices. It found that in 1934 when the United Textile Workers, then affiliated with the American Federation of Labor, was being established in the Piqua plant, the petitioner, through its executive officers, called a meeting of its employees during working hours and urged that if a union was desirable, a company union should be established, and some weeks later placed in the pay envelope of each employee, a statement of its opposition to organization and particularly to outside unions. As a result, the organizing effort among its employees "died down." In the spring of 1936, unionization activities were revived upon the arrival of an A. F. of L. organizer and a proposed contract was presented to the petitioner. It was not agreed to, because, according to the petitioner, it conceived that the union did not represent a majority of its employees. A strike followed,—subsequently settled. The petitioner then circulated among its employees a statement with the enclosure of a projected newspaper advertisement addressed to them, reciting that the T. W. U. had failed to organize a majority of the workers. It threatened to close its plant, for the reason that it was unwilling to continue an investment in a business governed "not by sane, conservative management, but by mob rule."

The Board also found that shortly after August 1, 1935, the petitioner employed a private detective agency, and that one of its operatives entered the plant ostensibly as a production worker and made periodic reports of union activity to its officers. It found that the strike was settled through the agency of one Strain, an industrial relations counsellor for the National Underwear Institute, an association of manufacturers, of which the petitioner was a member, and that thereafter Strain and an employee by the name of Wright, originally employed by the petitioner as a guard during the strike,

and with an extended career in labor relations, including some activity as a strike breaker, were responsible for the organization of the F. I. U., and that the celerity with which the petitioner negotiated and gave approval to a contract submitted by the F. I. U., in contrast to the hostility earlier shown to the T. W. U., indicated its bias in favor of the one and against the other union, so as to justify a finding of domination and interference with employee organization.

■ The petitioner challenges the relevance of pre-Act hostility to the outside unions and its pre-Act preference for a company union. But earlier support of or predilection for a company union, unless later unequivocally repudiated so as to induce confidence in employees in their freedom of choice, has been held to be relevant in determination of unfair labor practices, N. L. R. B. v. Link-Belt Company, 61 S.Ct. 358, 85 L.Ed. ——, announced January 6, 1941. The petitioner explains its threat to close the plant as a protest not against unionization of its employees but as against the violent threats and intimidation of the T. W. U. during the strike, and it says that no scintilla of proof was offered that the statements contained in its circulars addressed to its employees were in any respect untrue, mendacious or unfair, or that they tended to discourage membership in the T. W. U. It insists that it was justified in condemnation of the strike as illegal because its purpose was to compel the petitioner to make a contract with a minority of its employees, and that to have acceded to this demand would itself have been a violation of law. It explains its employment of the Corporation Service Company Detective Agency, and the placing of its operative in the plant, as necessitated by the excessive number of thefts that had occurred, and says that even though the operative reported on union activities there was no proof that this information constituted or resulted in any interference, restraint or coercion of its employees in their efforts at organization.

■ Eliminating tenuous inferences drawn by the Board from irrelevant and immaterial circumstances, there still remains in the record substantial evidence from which a reasonable inference flows that the petitioner interfered with the free exercise by its employees in their rights to self-organization. It is clear that it favored the F. I. U. over the T. W. U. union, and that in the organization of the former there was active assistance given through Wright and

Strain for whose acts the petitioner must accept responsibility. Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38. It is now settled that the employer may gain no advantage from the acts of those who reasonably may be regarded by employees as representing the policy of the management, and that neither the principles of agency nor the doctrine of respondeat superior are applicable, where the consequence of such acts is employee fear of reprisals if the inside union is not supported. H. J. Heinz Co v. N. L. R. B., 61 S.Ct. 320, 85 L.Ed. ——, announced January 6, 1941. A statement to the employees of the petitioner that it might be necessary to close the plant, made during a period when unionization of its employees was sought to be effected, must be regarded as coercive, notwithstanding sincere belief on the part of the petitioner's executives that such result would of necessity follow. N. L. R. B. v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288. While a bona fide shut down of a plant does not of itself constitute a violation of the Act, undoubtedly a threat or prediction that it might have to close, if unionized, must necessarily affect the judgment of its employees and interfere with their freedom of choice. It·cannot be disassociated from hostility to unionization as such, even though alone directed against unionization through violent and intimidating practices.

■■ The espionage and surveillance finding by the Board is sustained by substantial evidence. The employment of undercover operatives to spy upon employees in their effort to organize, is a violation of the statute. The authorities are collected in our recent decision, Ohio Power Co. v. N. L. R. B., 6 Cir., 115 F.2d 839, announced December 4, 1940, though that case is distinguished from this in that there was no proof of undercover work of any kind by the employee there, accused. If mere assertion of a purpose in admitted espionage to discover theft by employees is to repel an inference that it has other significance, the provisions of the statute in this respect are incapable of enforcement. There are adequate government agencies for prevention of and discovery of criminality. Given employer hostility to unionization, employment of a private detective agency and the installation of an operative in the guise of a production worker, the billing of union dues by the agency as expense, reports to management immediately destroyed, and the presence of the investigator at union meetings, all taken together not only sustain but compel the inference that the primary purpose of the employment of the private agency was espionage over and surveillance of union activities.

The Board consents to a modification of the notice provision in its order to conform to its present practice. As so modified a decree may be entered for enforcement. The petition to review will be denied.

It is so ordered.