NATIONAL LABOR RELATIONS BOARD v. GROWER–SHIPPER VEGETABLE ASS'N OF CENTRAL CALIFORNIA et al.

No. 9577.

Circuit Court of Appeals, Ninth Circuit.

July 21, 1941.

GARRECHT, Circuit Judge, dissenting in part.

———◆———

Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Mortimer B. Wolf, Bertram Edises and Edward J. Creswell, all of Washington, D. C., for petitioner.

George M. Naus, of San Francisco, Cal., and Sidney L. Church, of Salinas, Cal., for respondent.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

Enforcement of an order made by the National Labor Relations Board is sought by it.

Grower-Shipper Vegetable Association of Central California, a California non-profit corporation, hereafter called the Association, is an association of grower-shippers and handlers of lettuce and other vegetables in Monterey, Santa Cruz, and San Benito Counties, California, making up what is known as the Salinas-Watsonville district. Western Growers' Protective Association, a California non-profit corporation, hereafter called Western Growers, is an association of growers, shippers, distributors, and handlers of vegetables in California and Arizona. Both the Association and Western Growers are respondents in this case. The other respondents are individuals, partnerships or corporations engaged in the Salinas-Watsonville district, and with the exception of five, were members of the Association during the summer of 1936.

The Salinas Watsonville district is the chief source of lettuce shipped in car-lots in the United States. During its season, over 75 per cent of all car-lot shipments of lettuce in the United States originate there. There are about 300 crates of lettuce to a car-lot. Since jurisdiction is conceded to be in the Board, further facts regarding that point need not be stated.

Field crews, which are usually Oriental and Philippine workers, cultivate and eventually cut the lettuce. The lettuce is then taken from the fields in field crates or trailers to packing sheds which are usually located in towns next to railroad sidings and close to ice sheds. At the sheds, the lettuce is cleaned, trimmed, graded, and packed in crates with paper and ice by crews which usually are Americans. The crates are then loaded on refrigerator cars standing on sidings by the sheds, the cars are iced, and the doors thereto are sealed. A different skill is required to pack lettuce than that required in cultivating and cutting it. The wage-scale for the packing employees or shed workers is different from that of the employees engaged in cultivating and cutting the lettuce.

While there is some latitude in the period in which lettuce can be picked, it cannot be left unpicked for more than 3 or 4 weeks after ripening. At the height of the season approximately 3,000 workers are employed in the Salinas-Watsonville packing sheds. However, during the season, which lasts from approximately April 1 to December 1, the amount of employment fluctuates radically, and at any particular shed varies from time to time. As a consequence, a large proportion of the workers are forced to move from shed to shed in quest of employment, and only a few retain work with the same shed throughout the entire season. Between the time when the season ends and another season begins, many of the workers migrate to the Imperial Valley in southern California and to southern Arizona, which enjoy a short lettuce season during such time.

The extremely perishable nature of lettuce, after it is picked, requires that the

packing, icing, and shipping proceed without interruption. The process has been so organized that ordinarily lettuce is moving out in refrigerator cars at latest by the evening of the day on which it is picked, but ordinarily it is not more than 3 or 4 hours from the time of receipt of the lettuce at the packing sheds to time of shipment thereof.

The great majority of the respondents, except the Association and Western Growers, pack lettuce grown by themselves, and lettuce which they purchase elsewhere. Five of such respondents pack lettuce grown by themselves only, and three do not grow, but pack lettuce which is purchased from other growers.

Fruit and Vegetables Workers' Union of California, No. 18211, hereafter called the Union, was a state-wide labor organization, formed in 1932, and affiliated with the American Federation of Labor. It admitted to membership all workers engaged in the various processes of packing-shed work from the receipt of the lettuce as it was brought from the fields through the loading of packed crates on freight cars, but did not admit to membership any field or "stoop" workers.

In the summer of 1934, the Union called a strike against various shippers in the district, and an Industrial Relations Board was set up to arbitrate the Union's demands. On October 8, 1934, that board issued its award setting forth the conditions of labor which were to obtain in the packing sheds until September 1, 1935. After negotiation in the summer of 1935, the Union and the Association agreed that the terms of the award should be extended one year to September 1, 1936, the agreement being evidenced in letters exchanged between the Union and the Association.

During the year 1936, there were disputes between the Union and members of the Association, and tension between them increased. The Association employed agents to find out what they could about the Union's programs, policies and activities. The Board did not find that the Union or any of its members knew of such espionage activities of the Association.

The Association throughout the entire summer of 1936 treated the Union as the collective bargaining agent of all the packing employees in the district. It was stipulated that the Union was the collective bargaining representative of a majority of the employees in each shed in the district.

On July 27, 1936, the Association wrote the Union that it was ready to enter negotiations for the conclusion of a new agreement to begin on September 1, 1936. The Association and the Union[1] met on August 6, 1936, at which meeting the Union submitted a proposed contract to the Association containing 52 paragraphs which had been approved by members of the Union. One paragraph provided for recognition of the Union as the collective bargaining agent for all the packing employees, and another provided for preferential hiring, when workers belonging to the Union were available. The meeting adjourned, to convene again on August 12, 1936.

On that day the Association reported that its members at a meeting held previously by one day, had rejected the proposed contract. At the meeting of August 11, 1936, the Association received a power of attorney signed by 72 firms, including some non-members and all but two of the members of the Association, empowering the Association to negotiate for a new agreement as the exclusive agent of the signers. The power of attorney was irrevocable for one year. It was agreed at the meeting of August 12, 1936, that the Association should offer a proposed contract on August 18, 1936. The proposed contract presented by the Association on that day was similar to the existing one but did not provide for recognition of the Union or for preferential hiring. The Union agreed to submit the proposed contract to its members, and the meeting adjourned until August 25, 1936.

On the latter date, the Union reported that its members had rejected the Association's proposal, and had directed it to negotiate only on the basis of the proposal first made by it. The news release issued jointly by the Association and the Union stated that the Union demanded a preferential hiring clause which demand was not subject to bargaining or arbitration. Negotiations were resumed the following day but no agreement was reached regarding the preferential hiring clause.

On August 28, 1936, the Association caused an advertisement to be published in a local newspaper. The advertisement contained headlines as follows: "Workers:

---

[1] In such meetings only representatives of the respective organizations met.

Think! Read This Ad—Study The Agreement Did You Have A Chance To Vote On It?" The advertisement stated: that the majority of the workers in the industry were honest, law-abiding, home-loving, hard-working citizens; that the shippers had carefully studied the Union's proposal and had rejected it as being "unfair, un-American, impossible of being lived up to by employers and not a true reflection of the attitude or the desires of the sane, law-abiding element which we believe constitutes the majority of our employees". It asked the workers if they had had an opportunity to read and express their views on either the Union's proposal or the Association's proposal. It also stated:

"Yours is a 'democratic organization'. You who make up the sane, conservative, straight-thinking group, for your own sakes, do this:

"Set up your own leadership and committees. Demand that your organization follow the dictates of the majority. Refuse to be dominated by a radical minority, whose 'orders' certainly don't come from you. Demand that you be given an opportunity to consider all important problems and most important, demand that you be given the American opportunity of the secret ballot when passing on such problems.

"We the Grower-Shippers, are trying to meet this problem squarely, fairly and honestly. We are earnestly trying to reconcile our problems of operation with yours of employment. You are urged to meet us at least half way, for your own sakes as well as for ours."

There followed a copy of the Association's proposal, following which were statements to the effect that the Union reported to the Association that the Union would not even discuss such proposal, and saying that full discussion of the Union's proposal would be futile unless the Association first agreed to the preferential hiring clause.

On September 1, 1936, when the existing contract had expired, the Association caused to be published in local newspapers a "Notice To Workers In The Lettuce Industry". The notice stated that whereas the Union had "failed to negotiate or ratify an agreement" the wage scale and working conditions set forth in the notice would prevail beginning on that day. The notice also stated that any work performed by any worker prior to September 4, 1936 would not obligate such worker to continue to work under the wage scale and working conditions mentioned; that work performed thereunder on or after September 4, 1936, would constitute a binding contract for the period from September 4, 1936 to August 31, 1937, but that if the Association reached an agreement with the Union as to the wage scale and working conditions, then the former agreement would become ineffective. Following this there was a schedule of wages and working conditions, based upon the proposal of the Association submitted on August 18, 1936. The Union had previously assured the Association that work would continue after September 1 even if no agreement was reached.

The Association and the Union met on September 1, 1936. The Union submitted a second proposed contract which was mostly a rearrangement of its first proposed contract. Negotiations continued until early the following morning, when it was agreed that a modified provision for preferential hiring would be submitted to the members of each organization, and that negotiations would be resumed that evening. That evening, the Association reported that its members had rejected the modified provision. The Union never submitted the modification to its members. The Association submitted a second proposed contract which was based on the expired contract, with the addition of certain of the Union's demands. One of its provisions was that the Union should be the collective bargaining agent for its members only.

On the evening of September 3, 1936, the members of the Union rejected the Association's second proposal, and voted to go on strike beginning on September 4, 1936. The strike began on that date. The Union and the Association negotiated on September 11, 1936, and subsequently negotiated through third parties.

Tracy-Waldron Fruit Company, hereafter called Tracy, which was not a member of the Association, had executed the power of attorney to the Association. On September 11, 1936, Tracy wrote the Association stating that it was revoking the power of attorney, and then entered into an agreement with the Union. Tracy then attempted to obtain supplies needed for packing lettuce, but was unable to do so because the Association induced the suppliers to refrain from furnishing Tracy with supplies. Tracy was unable to pack lettuce, and on September 14, 1936, wrote

the Association, cancelling its attempted revocation of September 11, 1936.

During the strike, and on September 12, 1936, the Association instituted a central hiring system, under which it required all applicants for jobs to apply at a hiring hall. As a result of the system, 10 individuals either were refused employment or were discharged after being employed. Cards were kept which contained information regarding Union members. The Association relied on such cards to disclose how active Union members were in Union activities.

On October 16, 1936, sixteen charges were filed with the Board. Each charge named a different respondent and charged the commission of unfair labor practices defined in § 8(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158 (1, 3, 5).

The strike ended on November 2, 1936, after the Union voted to release its members and permit them to apply for reemployment.

On January 8, 1937, the Union filed a supplementary charge for each charge previously filed on October 16, 1936. On February 27, 1937, fifteen charges were filed with the Board, each naming a new and different respondent. On March 15, 1937, the Board's Amended and Consolidated Complaint was issued. It alleged that the 31 respondents had engaged in unfair labor practices defined in § 8(1), (3) and (5) of the act. Hearings began on April 12, 1937 and were completed on May 18, 1937.

On June 24, 1937, at a regular meeting of the Union, it was voted that the Union's Bulletin Committee be instructed to "arrange for a C.I.O. meeting as soon as possible". The meeting was held on June 30, 1937, and was attended by about 500 persons, of whom about 250 registered as union members. A resolution was adopted "that packing house employees seek immediate affiliation with the C.I.O." A ballot was taken on the question of affiliation with the Committee for Industrial Organization,[2] and the court was 238 in favor of affiliation, and 12 against. At the regular meeting of the Union on July 1, 1937, it ratified the resolution adopted at the meeting of June 30, 1937. The charter of the Union, issued by the American Federation of Labor, was revoked prior to July 12, 1937. The group received a certificate of affiliation from United Cannery, Agricultural, Packing and Allied Workers of America, affiliated with the Committee for Industrial Organization, on July 31, 1937, and hereafter will be called United.

All but 2 of the 10 officers of the Union became members of United. Substantially the same persons attended the meetings of United who had before attended the meetings of the Union. Meetings of United were held at the same place and times as the meetings of the Union had been. The functions of United were the same as the Union's functions had been.

The Board held a further hearing regarding the question of United's successorship to the Union, on September 10, 1937. The Board made its decision and order on September 15, 1939. The findings of the Board will be stated infra in detail in connection with the particular questions raised. In summary, the Board found that (1) respondents refused to bargain collectively with the Union on September 2, 1936, by submitting the proposed contract restricting recognition of the Union; (2) respondents interfered with, coerced and restrained the employees in the exercise of their rights by (a) publishing the advertisement of August 28, 1936; (b) publishing and posting the notice of September 1, 1936; (c) the boycott of Tracy; (d) the employment of espionage; and (e) causing discrimination in reinstatement and employment after the strike.

The Board's order, which will be considered more in detail infra in connection with the questions raised, in general required respondents to cease and desist from refusing to bargain collectively with United, from employing espionage, and from in any other manner interfering with the employee's rights, and affirmatively ordered respondents to bargain collectively with United, and to reinstate with back pay certain individuals. Certain respondents were excepted from some of the provisions of the order, but since the exceptions have no bearing on any of the questions presented, they need not be related. The Board filed its petition for enforcement in this court on July 23, 1940.

Collective Bargaining Provisions.

■ The Board, as stated, found that the provision in the Association's proposal of September 2, 1936, restricting recognition

---

[2] Now the Congress of Industrial Organizations.

of the Union "constituted a clear refusal" to bargain. Based on that finding, the Board made four provisions of its order. Paragraph 1 ordered 19 named respondents, but not including the Association, to cease and desist from refusing to bargain collectively in respect to rates of pay, wages, hours and other conditions of employment with United, successor to the Union. Paragraph 2 required the Association, when acting for itself, the respondents named in paragraph 1, or for any of its members, for the purpose of collective bargaining, to cease and desist from refusing so to bargain with United, successor to the Union. Paragraph 8 affirmatively requires the respondents named in paragraph 1 to bargain collectively with United, successor to the Union, upon request. Paragraph 9 affirmatively required the Association, when acting as agent for any of the respondents named in paragraph 1, or any of its members, for the purpose of collective bargaining, to bargain collectively with United, successor to the Union.

Respondents contend that these four paragraphs cannot be enforced because: (1) the submission of the proposal could not alone constitute a refusal to bargain; (2) if such submission was such refusal, then the rule of law that one cannot faithfully serve two masters would legalize the submission of the proposal, since in any conflict of interest between union and non-union men, the Union actually would represent itself only; and (3) the finding that United was the successor to the Union, is not sufficient to support the order, in the absence of a finding that a majority of the employees had designated United as their bargaining agent. The Board contends that (1) where a union is a majority representative, it is entitled to exclusive recognition, and "that the employer's action in recognizing the union as bargaining representative of its members only constitutes a refusal to bargain collectively"; and (2) the shift of membership from the Union to United does not affect the order.

We hold that under the facts of this case, there is no substantial evidence to support the finding that the proposal constituted a refusal to bargain, and that paragraphs 1, 2, 8 and 9 of the order which are based thereon, cannot be enforced. The Board refused to find whether the advertisement of August 28, 1936, or the notice of September 1, 1936, were refusals to bargain.

It expressly found that the events subsequent to the commencement of the strike did not disclose a refusal to bargain. It did not find that any action of respondents was a refusal to bargain, other than the submission of the proposal. It found that Association negotiated with the Union prior to, at, and subsequent to the submission of the proposal. It did not find that the Association could or should have negotiated more. It did not find that the submission of the proposal, or anything else, showed a lack of good faith in negotiating by the Association. In short, the Board in effect found that the Association did not negotiate when in fact and at the very time the proposal was submitted, the Association was negotiating in good faith.

The Board's contention does not meet the precise question raised here. The Board contends that the employer's action in recognizing the union as bargaining representative of its members only constitutes a refusal to bargain. Such a question is not here presented. The question presented here is whether there is any substantial evidence to show that the employer recognized the union as bargaining agent of its members only. The Board found that "Throughout the entire summer of 1936 up to September 2, the * * * Association treated the Union, without question, as representative of all the shed workers of the district", and the only thing suggested by the Board as evidence to show a lack of such recognition is the submission of the proposal.

Findings of the Board are conclusive only when supported by "substantial evidence" which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. Evidence which is unsubstantial in a jury case in court, does not become substantial merely because it is before the Board, for the evidence required to support the Board's findings "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury". Labor Board v. Columbian Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. "Where the evidence upon any issue is all on one side or so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury". Gunning v. Coo-

ley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720.

Here we think that the evidence is so overwhelmingly to the effect that respondents did not refuse to bargain, as to leave no room to doubt that fact, and that a reasonable mind would not accept the evidence of the mere fact of submitting a proposal as adequate to support a conclusion that respondents refused to bargain.

None of the cases relied on by the Board are in point. In all of them, the employer in negotiating, negotiated with the union as the representative of its members only. Such is not the case here.

### Interference with Rights of Employees.

■ Espionage. The Board found that "by espionage upon the union activities of the shed workers employed by the Association's members, the Association and its members named as respondents interfered with, restrained, and coerced such employees in the exercise of the rights guaranteed by Section 7 of the Act [29 U.S.C. A. § 157]". Based on that finding, the Board by paragraph 4 of its order, required the Association, when acting for itself or as agent or in the interest of any of its members, the other respondents, and their respective officers, agents, successors and assigns, to cease and desist from maintaining surveillance or employing any manner of espionage for the purpose of ascertaining or investigating the activities of United or any of the employees.

Respondent contends that paragraph 4 of the order cannot be enforced because there was no evidence that the employees knew of the surveillance, and unless they did have such knowledge, the surveillance could not have had any effect on the exercise of rights by employees. The Board makes no reply to this contention other than to assert generally that espionage constitutes interference, restraint, and coercion.

While it has been said, generally, that espionage by the employer is a violation of the statute (Ohio Power Co. v. National Labor Relations Board, 6 Cir., 115 F.2d 839; Atlas Underwear Co. v. National Labor Relations Board, 6 Cir., 116 F.2d 1020), only one case has been called to our attention which discusses the particular question raised by respondents, and in that one, it was not decided. Montgomery Ward & Co. v. National Labor R. Board, 8 Cir., 115 F.2d 700. National Labor Relations Board v. National Motor B. Co., 9 Cir., 105 F.2d 652, 657, is not in point. That case disclosed no finding that the surveillance did interfere with, restrain or coerce the employees in the exercise of their rights, whereas here there was such a finding.

Can there be interference, restraint or coercion in the absence of knowledge thereof by the employees? In the absence of anything indicating a contrary meaning, we think the dictionary meanings of "interfere", "restrain" and "coerce" must be accepted. Casual examination of the dictionary discloses that a person may be interfered with, restrained or coerced without knowing it. We therefore hold that the contention of respondents does not prevent enforcement of paragraph 4.

■ Interference Generally. The Board found that respondents interfered with, restrained and coerced the employees in the exercise of the rights guaranteed them by § 7 of the act by (a) publishing the advertisement of August 28, 1936; (b) publishing and posting the notice of September 1, 1936; (c) the boycott of Tracy; and (d) causing discrimination in reinstatement and employment after the strike. Based on these findings, the Board, by paragraph 5 of its order, required the Association when acting for itself, or as agent or in the interest of any of its members, each of the other respondents, and their respective officers, agents, successors, and assigns to "cease and desist from in any other manner interfering with, restraining, or coercing their employees and the employees of members of the * * * Association * * * in the exercise of the right to self-organization, to form labor organizations, to join or assist United * * * successor * * * to * * * Union * * * or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act".

The acts designated (a), (b), and (c) above were all found by the Board to constitute an interference with the union's efforts to bargain collectively. It is therefore unnecessary to consider all three of them since if one of them is sustained, it would support the same order that all together would. We therefore will state the opposing arguments regarding (b) only.

The notice of September 1, 1936, seems inoffensive in and of itself. However, the Board found that the "attempt to obtain security as an attempt either to provoke a strike or to impair the prestige and bargaining position of the Union". It reached that conclusion on the following reasoning: there was no need for the Association or its members to obtain contracts, because the Union had assured the Association that work would continue after September 1, 1936, even if no agreement had been reached; the Association could easily anticipate that the terms would be objectionable to the Union because it had already rejected such terms; the conclusion of individual contracts would naturally weaken the position of the Union in any further bargaining for a collective agreement, because the Association would already have the security afforded by existing agreements; and the Association could therefore reasonably anticipate that the notice would either provoke a strike or make the Union "lose face" with its members.

The conclusion of the Board is not unreasonable. We think reasonable men might differ as to the effect of the publication and position of the notice, and therefore the Board's finding is conclusive. Gunning v. Cooley, supra, 281 U.S. at page 94, 50 S.Ct. 231, 74 L.Ed. 720.

Respondents contend that since the collective agreement had expired, they had the right to fix the terms of employment by unilateral action. Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. The act prohibits interference with, restraint and coercion of the employees in the exercise of the rights guaranteed in § 7. § 8(1). Interference, restraint and coercion are not acts themselves but are descriptive and are the result of acts. Whatever acts may have the effect of interference, restraint and coercion are included in those terms, and are therefore prohibited. Thus they include a great number of acts which, normally, could be validly done, but when they interfere with, restrain or coerce employees in the exercise of their rights, they are prohibited by the act. Here although respondents normally had the right to fix the terms of employment by unilateral action, they could not exercise such right to interfere with, restrain or coerce the employees. National Labor Relations Board v. Superior Tanning Co., 7 Cir., 117 F.2d 881, 890.

No contention is made that respondents' action in publishing the notice was an exercise of the right of free speech. On that question, we express no opinion.

Since the interference was an interference with the efforts of the Union to bargain collectively only, as the Board found, modification of paragraph 5, is required by National Labor Relations Board v. Express Publishing Company, March 3, 1941, 61 S.Ct. 693, 700, 85 L.Ed. 930. That case is exactly in point and the precise language of the modification there, may be used here.

The other act of respondents which the Board found to be interference, restraint and coercion of the employees, and which is designated as (d) above, was the act of causing discrimination in hire and tenure of employment of employees on account of their union activities. Since the finding is not challenged, the only question remaining for consideration is the kind of order which the Board has power to make based on such finding.

In Labor Board v. Express Publishing Company, supra, the court said that the act "does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely because the violation of one has been found. To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past. * * *"

We think paragraph 5 of the order should go no further than to order the parties therein to cease and desist from in any manner interfering with the efforts of United to bargain collectively with such parties, and from in any manner discriminating, or causing other employers to discriminate, against any individual on account of union activities, in regard to hire or tenure of employment or any term or condition of employment.

### Reinstatement.

Specific Individuals. The Board's decision and order contains a part entitled "The Remedy". Therein the Board stated that it would order reinstatement or em-

ployment of the 10 individuals mentioned above, and back pay for the period from the earliest date upon which the discrimination expressed itself to the date of the offer of reinstatement or employment, less net earnings of the individual during such period, the pay to be calculated on the basis of the average of his weekly earnings during the year ending September 3, 1936. The Board also stated that such part of its order would run against the Association and those of its members who were respondents because the Association and its respondent members "participated in the scheme which produced the discrimination".

Accordingly, paragraph 6 of the order, requires the Association and its respondent members, to "cause an offer of immediate and full reinstatement to or employment in their former positions or the position substantially equivalent thereto to be made to" the 10 individuals previously mentioned herein. Paragraph 7 required the respondents mentioned in paragraph 6 to pay the back pay in the manner mentioned in part of the decision entitled "Remedy".

Respondents contend that paragraphs 6 and 7 are invalid because by their terms the respondents are compelled to hire the 10 named individuals. Those paragraphs are unobjectionable on that ground. Phelps Dodge Corporation v. National Labor Relations Board, April 28, 1941, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

■ Respondents further contend that such paragraphs are invalid because the order is a joint order against respondents who were not former employers, and rely on National Labor Relations Board v. Hearst, 9 Cir., 102 F.2d 658. That case, however, is not controlling here because the other respondents there did not participate in the discrimination against the individuals. Here, the respondents liable participated in the scheme pursuant to which the discrimination was accomplished and by virtue of § 2(2) of the act, 29 U.S.C.A. § 152(2), which defines "employer" as including "any person acting in the interest of an employer, directly or indirectly" we think the order is not beyond the powers of the Board.

■ Respondent further contends that such joint order is invalid because it is not supported by a joint charge. The Board issued proposed findings and order, but respondents failed to except thereto upon that ground or any other ground. Not having been raised before the Board we are unable to consider this objection. § 10(e), 29 U.S.C.A. § 160(e).

■ Reinstatement Generally. In the part of the Board's decision entitled "Remedy" the Board stated that it would order reinstatement of each striker to his former or a substantially equivalent position. It further stated that all employees hired since the commencement of the strike must be discharged, if necessary in order to provide positions, and that back pay would be ordered except as to those who might be refused reinstatement pursuant to the Board's order.

Accordingly, paragraph 10 required each respondent, upon application, to offer to the packing employees employed by it on September 3, 1936, full and immediate reinstatement, and paragraph 11 required back pay in the event any respondent refused to make an offer of reinstatement.

Respondents contend that paragraphs 10 and 11, as well as 6 and 7, cannot be enforced because the strike occurred as a result of a labor dispute, and they therefore had the right to replace the strikers, and are not required to discharge them. Labor Board v. Mackay Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; National Labor Relations Board v. Lightner Pub. Corp., 7 Cir., 113 F.2d 621. The difficulty with that argument is that in the cases relied on, the strike in such cases did not occur as the result of an unfair labor practice, but from a labor dispute, whereas here the Board found that the strike occurred as the result of an unfair labor practice, i. e., by the publication and posting of the notice of September 1 and by the attempt to restrict recognition of the Union to its membership only. Since the strike occurred as the result of an unfair labor practice, the order is not invalid because of the reasons urged. Phelps Dodge Corporation v. Labor Board, supra.

■ Respondents also contend that when the strike ended, the strikers lost their status as "striking employees" and therefore could not be an "employee", because the definition of "employee" excludes those whose work has ceased as a result of a labor dispute which is not current. § 2(3). However, that definition includes also as an employee, one whose work has ceased as a consequence "of any unfair labor practice". The strikers here are in that category.

■ Agreed Modification. The Board consents to the modification of paragraphs 7 and 11, pursuant to Republic Steel Corp. v. Labor Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, by striking therefrom the following: "and pay over the amount, so deducted, to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects". Such modification will be made.

### Laches.

■ Finally it is contended that enforcement of the order should be denied because of the long delay of the Board in concluding the case. Considering the size of the record here (9 volumes containing 3873 pages) we are unable to say that laches is shown.

Enforcement of paragraphs 1, 2, 8 and 9 of the order is denied; paragraphs 5, 7 and 11, are modified as above stated, and as so modified are enforced; and all other parts of the order are enforced.

GARRECHT, Circuit Judge (dissenting in part).

With that part of the main opinion which nullifies the finding of the Board whereby it determined that "Association's proposal of September 2, restricting recognition of the Union as representing its members only," constituted a refusal to bargain collectively within the meaning of the Act, I do not agree. To my mind, the evidence to sustain this finding is as substantial as that which supports other findings which the opinion upholds.

It is admitted that the Union had been duly authorized to represent all the workers, non-union as well as union. The purpose of the respondents to restrict the Union to act or bargain solely for its own members or to offer to bargain with it on that basis only, did not meet the obligation of the respondents under the law. The main opinion obscures this crucial fact by eloquent emphasis about what the Board did not find or failed to find. The majority opinion seems to indicate that if respondents negotiated at all with the Union, this would preclude any finding of refusal to bargain collectively. Manifestly much of this negotiating on other matters was conversational camouflage utterly lacking in good faith. Indeed, one of the witnesses was asked if certain phases of it were not mere sham. Respondents objected to an answer as being a conclusion. However, the Board could draw the conclusion and there being substantial evidence in the record to support it this court is bound by the finding. The fact remains that the vital requirement that the Union be restricted to bargain only for its own members, which was injected into the discussion by respondents was never withdrawn. This is quite sufficient to sustain the Board in its finding:

"* * * The language of the Association's proposal of September 2, restricting recognition of the Union as representing its members only, constituted a clear refusal so to bargain. An employer cannot fulfill his obligation to a labor organization which is the exclusive representative of his employees by offering to bargain with it for its members only. We accordingly find that, on September 2, 1936, the respondents, except Western Growers' Protective Association, H. P. Garin Company, and E. H. Spiegl, refused to bargain collectively with the Union. By so doing they also interfered with, restrained, and coerced the employees of members of the Association and of those firms which the Association was authorized to represent, in the exercise of the rights guaranteed in Section 7 of the Act."

In sustaining a similar finding the Supreme Court in the case of National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, at page 358, 60 S.Ct. 569, at page 574, 84 L.Ed. 799, said: "* * * There is testimony that at the meeting with the Union representatives on July 29th petitioner's president declined to recognize the Union as the bargaining representative of all the employees, and declared that he would negotiate with it only as the bargaining representative of the Union members, refusing to bargain with it as the representative of all the employees, a plain violation of the Act. §§ 8(5), 9(a). This was followed by petitioner's refusal, on August 2nd, to negotiate with Union representatives. There was also evidence from which the Board could have found that the negotiations on July 20th and July 29th were not entered into by the petitioner in good faith, and were but thinly disguised refusals to treat with the Union representatives."

The findings of the Board should be sustained.